1  Thomas G. Mackey (State Bar No. 174572)
   Jennifer B. Hodur (State Bar No. 211948)
2  JACKSON LEWIS LLP
   725 South Figueroa Street, Suite 2500
3  Los Angeles, California  90017-5408
   (213) 689-0404 - Office
4  (213) 689-0430 – Fax
   mackeyt@jacksonlewis.com
5
6  Attorneys for Plaintiff
   The Guardian Life Insurance Company of America
7
8              UNITED STATES DISTRICT COURT
9            CENTRAL DISTRICT OF CALIFORNIA
10
11 THE GUARDIAN LIFE INSURANCE        ) CASE NO.: CV07-05732 GPS (FMQx)
   COMPANY OF AMERICA, a corporation, )
12                                     )
13            Plaintiff,               )
                                       )
14       v.                           ) **FIRST AMENDED COMPLAINT FOR**
                                       ) **DAMAGES AND INJUNCTIVE**
15 JOHN ANDRAOS, an individual,       ) **RELIEF**
   ANDRAOS CAPITAL MANAGEMENT         )
16 & INSURANCE SERVICES, a            )    1. **BREACH OF CONTRACT**
   corporation, UNION CENTRAL LIFE    )    2. **BREACH OF THE COVENANT OF**
17 INSURANCE COMPANY, a corporation,  )       **GOOD FAITH AND FAIR DEALING**
   JOSEPH MIGNOGNA, and ALI           )    3. **BREACH OF FIDUCIARY DUTY**
18 DERAKHSHANFAR, individuals and     )    4. **INTERFERENCE WITH**
   DOES 1-50.                         )       **PROSPECTIVE ECONOMIC**
19                                     )       **ADVANTAGE**
              Defendants.              )    5. **INTERFERENCE WITH**
20                                     )       **CONTRACT**
21                                     )    6. **MISAPPROPRIATION OF TRADE**
   JOHN ANDRAOS, and ANDRAOS          )       **SECRETS**
22 CAPITAL MANAGEMENT &               )    7. **FRAUD**
   INSURANCE SERVICES, INC.           )    8. **NEGLIGENT**
23                                     )       **MISREPRESENTATION**
           Counter-claimants,         )    9. **CONVERSION**
24                                     )   10. **VIOLATION OF CALIFORNIA**
        vs.                           )       **BUSINESS & PROFESSIONS CODE**
25                                     )       **§§17200 ET SEQ.**
   THE GUARDIAN LIFE                  )
26 INSURANCE COMPANY OF               )
   AMERICA, INC.                      )
27                                     )
           Counter-defendant.         )
28 _____  )

                                    1

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## NATURE OF ACTION

1.     Plaintiff, Guardian Life Insurance Company of America ("Guardian"), directly and through its subsidiaries, provides life, disability, health and dental insurance products, and offers 401K, financial products and trust services to individuals, businesses and their employees.

2.     Defendants, Andraos Capital Management & Insurance Services ("ACM"), John Andraos ("Andraos"), Joseph Mignogna ("Mignogna") and Ali Derakhshanfar ("Derakhshanfar") entered into binding contractual commitments to represent Guardian in the State of California.  These defendants thereby obligated themselves to advance Guardian's business interests and to avoid harming Guardian.

3.     In direct violation of their contractual commitments, and acting in concert with Defendant Union Central Life Insurance Company ("Union Central"), ACM and Andraos wrongly conspired to breach ACM's contract with Guardian, and to breach other legal obligations through their misappropriation of Guardian's trade secrets, and their conversion of Guardian's tangible and intangible property.

4.     To add insult (as well as further injury) to this injury, defendants ACM, Andraos, Mignogna and Derakhshanfar defrauded Guardian on their way out the door through misrepresentations that induced Guardian to advance commission payments, pay overrides, and credit expense reimbursements that these defendants had not earned, and which they knew, in light of their imminent departures to Union Central, could not

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    earn.  Based upon this conduct, Guardian seeks herein damages and injunctive relief

2    against all defendants.

3                        **PARTIES, JURISDICTION AND VENUE**

4

5        5.      Guardian is, and at all relevant times was, a corporation organized and

6    existing under the laws of the State of New York, with its principal place of business in

7    New York, New York.  Guardian is authorized to transact business in the State of

8    California.

9

10       6.      Andraos is, and at all relevant times was, a resident of La Canada,

11   California, in Los Angeles County.

12

13       7.      ACM is a General Agency of which Andraos is the principal.  ACM is a

14   California corporation, with its principal place in Glendale, California.  In connection

15   with ACM's business, Andraos applied for and maintained a broker/dealer registration

16   with the National Association of Securities Dealers ("NASD") and/or the Financial

17

18   Industry Regulatory Authority ("FINRA") reflecting his affiliation with and sale of

19   ACM's products.  Andraos and ACM were at all times required to comply with all

20

21   applicable regulations and orders related to the sale of insurance products, including but

22   not limited to those promulgated by the California Department of Insurance.

23

24       8.      Union Central is an Ohio corporation, and is licensed to do business and is

25   doing business in the State of California, in the County of Los Angeles.  Union Central

26   provides insurance products, financial products and/or trust services that are competitive

27

28   with those offered by Guardian.

---

3

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

9.      Mignogna is, and at all relevant times was, a resident of Burbank, California. Until August 31, 2007, Mignona was a Field Representative retained by ACM to sell products and services on behalf of Guardian.

10.      Derakhshanfar is, and at all relevant times was, a resident of Arcadia, California. Until August 31, 2007, Derakhshanfar was a Field Representative retained by ACM to sell products and services on behalf of Guardian.

11.      The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants named herein as Does 1 through 50, inclusive, are unknown to Guardian, who therefore sues said Defendants by such fictitious names.  Guardian will amend this Complaint to show the true names and capacities of the Defendants designated herein as Does 1 through 50, inclusive, when the same have been ascertained. Guardian is informed and believes, and thereon alleges, that the Defendants designated herein as Does 1 through 50, inclusive, are responsible in some manner for the obligations to Guardian as alleged herein.

## **FACTS**

12.      In or about February 1999, Guardian and Andraos entered into an Agreement of General Agency.  On or about January 1, 2003, Guardian and ACM entered into an "Agreement of General Agency which superseded the previous agreement.  The 2003 Agreement of General Agency was amended effective February 1, 2006.  The February 1, 2006 Agreement of General Agency (hereinafter the "ACM Agreement") is attached hereto as Exhibit 1.

4

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

13.    Pursuant to the ACM Agreement, Andraos and ACM committed to devote their full-time efforts to develop and manage the sale of Guardian's products and services throughout the State of California.  Andraos and ACM were empowered by the ACM Agreement to, inter alia, sell such products and services, to appoint agents and secure the services of Field Representatives ("FRs") to assist in the sale of such products and services, to collect monies in connection with the sale of such products and services, and to hold those monies in trust on behalf of Guardian.  In this regard, Andraos and ACM undertook the contractual obligation to act solely in the best interests of Guardian and to refrain from undertaking any actions that might harm Guardian's business throughout the State of California.

14.    ACM in fact recruited and retained FRs to assist in the performance of its duties for Guardian, including Mignona and Derakhshanfar.  These FRs, in turn, each executed Field Representative Agreements with Guardian.  Under these FR Agreements, Mignona and Derakhshanfar committed to make their principal business activity the solicitation of applications for business with Guardian.  Mignona and Derakhshanfar also committed to abide by all of Guardian's requirements.  Copies of these FRs' Field Representative Agreements are attached here as Exhibits 2 and 3.

15.    Guardian is informed and believes, and on that basis alleges, that in early August 2007, Andraos and at least three FRs flew to Cincinnati, Ohio, to meet with Union Central representatives to discuss Union Central procedures.

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

16.    Guardian is informed and believes, and on that basis alleges, that on or about August 22, 2007, Andraos sent out an electronic meeting notice to all of Guardian's FRs that worked with ACM.  This notice required them to attend a meeting in ACM's offices on August 29, 2007 at 10 a.m.  Guardian is informed and believes, and on that basis alleges, approximately 25 FRs that worked with ACM attended this meeting.

17.    ACM also arranged for six representatives from Union Central to attend this August 29, 2007 meeting.  Andraos introduced the Union Central representatives at the onset of the meeting.  Guardian is informed and believes, and on that basis alleges, that Union Central was aware of and knew the contents of the ACM Agreement and the FR Agreements with Guardian.

18.    In disregard for its obligations to Guardian under its existing ACM Agreement, Andraos announced to the FRs at this August 29, 2007 meeting that ACM no longer represented Guardian.  Guardian is informed and believes, and on that basis alleges, that Andraos and the Union Central representatives provided the FRs, all of whom were still under contract with Guardian, with information concerning Union Central's FR Plans as well as Union Central's FR benefits information.

19.    Guardian is informed and believes, and on that basis alleges, that Andraos, ACM and Union Central conducted this meeting for the specific purpose to induce Guardian's FRs to terminate their existing FR agreements with Guardian, to enter into business relationships with Union Central, and to thereby interfere with and disrupt Guardian's business relationships with its customers and policyholders.

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

20.     On or about August 29, 2007, Andraos informed Guardian that he would terminate the ACM Agreement, effective August 31, 2007, so that he could enter into a general agency agreement with Union Central.

21.     On or about August 29, 2007, fourteen FRs who worked at ACM submitted to Guardian letters of resignation and Field Representative Termination Forms. All of the resignation letters were dated August 16, 2007 and indicated a resignation effective date of August 31, 2007. All but one of the fourteen resignation letters were written in the same font and format. All fourteen of the FR Termination Forms listed "career change" as the reason for termination.

22.     On or about August 30, 2007, nine additional FRs submitted to Guardian resignation letters bearing the same language of those tendered the previous day. Each of the twenty-three FRs from whom Guardian received resignation letters had previously entered into Field Representative Agreements with Guardian. Mignogna and Derakhshanfar were among those who submitted their resignations.

23.     Guardian is informed and believes, and on that basis alleges, that Mignogna and Derakhshanfar have unlawfully drawn business away from Guardian by contacting and inducing former policyholders to surrender and/or lapse their policies. Guardian is informed and believes, and on that basis alleges, Mignogna and Derakhshanfar may take and/or have taken actions to recommend that the policyholders replace their existing policies with Guardian. Defendants Andraos, ACM and Union Central are and were aware of and agreed to this conduct.

7

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

24.    Guardian is informed and believes, and on that basis alleges, at the August 29 meeting Andraos advised the FRs that ACM would no longer process applications for Guardian's products and, as such, existing client applications could and/or should be rewritten so that the clients could obtain Union Central products.  Union Central was aware of this conduct and permitted it.

25.    Guardian is informed and believes, and on that basis alleges, that before ACM, Andraos, Mignogna and Derakhshanfar's departure from Guardian, they fraudulently signed up policyholders for Guardian's "Guard-O-Matic" ("GOM") premium payment plans.  These plans permit policyholders to pay their premiums in monthly installments throughout the year.  Under the GOM plan, FRs can be credited with a full year of commissions after Guardian receives the initial monthly payment.  In order to receive advance payments of the amounts credited, the General Agent, in this case Andraos, has to specifically request the advance payment. ACM, Andraos, Mignogna and Derakhshanfar signed up policyholders for GOM for the purpose of receiving their commissions in advance even though ACM, Andraos, Mignogna and Derakhshanfar knew that, in light of their imminent departures to Union Central, they could not earn those commissions.  In addition, ACM and Andraos were paid overrides and credited with expense reimbursements based upon these policies.  After Mignogna and  Derakhshanfar were advanced their commissions up front pursuant to the GOM program and Andraos's request, and after ACM and Andraos were paid  their overrides and credited with expense reimbursements, these Defendants facilitated requests by the

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

holders of the policies on which those commissions were paid to move from the GOM program to extended premium payment plans.  The purpose of moving off the GOM plan was to stop Guardian's ability to collect automatically the premiums on the policies for which Mignogna and Derakhshanfar already had received commissions, and for which ACM and Andraos were paid overrides and credited with expense reimbursements.  On information and belief, Mignona was advanced about $494,358, Derakhshanfar was advanced about $340,176, and at least one other FR was advanced about $67,528 pursuant to this scheme.  On information and belief, ACM and Andraos received in excess of $700,000 pursuant to this scheme.

26.    Guardian is informed and believes, and on that basis alleges, that Mignogna encouraged policyholders to cancel and obtain refunds on their policies by telling them to reject the policy on a "first look" basis.  This action was undertaken by back-dating the "first look" requests after the "first look" period had expired.  Mignogna presented the "first look" rejections on August 30, 2007, the day before he departed.  Guardian is informed and believes, and on that basis alleges, that Andraos and ACM were aware of and agreed to this conduct.

27.    ACM and Andraos arranged for FRs to sign up friends and family members for life insurance policies knowing those individuals would not pay the premiums necessary to cover the commissions paid to the FRs for those policies.  ACM and Andraos nevertheless asked Guardian to pay the FRs the full annual commission in advance on such policies, and obtained payment of their overrides and credited with

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

expense reimbursements.

28.   Guardian had and still maintains ownership of all the books and records relating to the work that Andraos performed for Guardian.  Section I, Part B, paragraph 5 of the ACM Agreement provides: "All books and records kept by the Principal in connection with the business of the Company are the property of the Company and shall be returned on demand."  (See Exhibit 1.)

29.   Andraos was required, upon Guardian's demand, to return to Guardian all of "Guardian's Property" which included all books and records relating to the work that Andraos performed for Guardian.  (See Exhibit 1.)

30.   In their Counterclaim Against the Guardian Life Insurance Company of America, ACM and Andraos seek declaratory relief in order to "advise[], directly or indirect, any of their clients or other policyholders or annuitants that they have the right to lapse, cancel or replace any Guardian insurance policy or annuity with Union Central." In addition, Union Central sent two letters, dated October 4, 2007 and October 19, 2007, regarding the replacement of Guardian's clients.  Implicit in the requested declaratory relief and the referenced correspondence is an effective admission that ACM and Andraos have the information they now seek permission to use.  In light of that apparent admission, Guardian alleges that Andraos and ACM have violated their obligation to turn over all documents and information that are the property of Guardian, including but not limited to all files on each of Guardian's FRs who worked out of ACM's office and all files on applicants for Guardian's insurance and annuity products.

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

31.   Further, Guardian has experienced policyholder activity that appears to be associated with the sudden departures of Andraos, ACM, Mignogna and Derakhshanfar, and the other FRs who left Guardian to work for Union Central.  These activities include, but are not limited to:

    a.  policy surrenders before the expiration of the policy term;

    b.  replacement of existing policies;

    c.  removal of insureds from Guardian's GOM premium payment plan and request for extended premium payment plan;

    d.  policy lapses; and

    e.  claimed rejection of policy on a "first look" basis where the first look period has expired and/or appears to have been back-dated.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT
### (Against Defendants ACM, Andraos, Mignogna and Derakhshanfar)

32.   Guardian hereby incorporates by this reference paragraphs 1 to 31 of this Complaint.

33.   Valid and enforceable contracts existed between Guardian, on one hand, and ACM, Andraos, Mignogna and Derakhshanfar, on the other.  Copies of these contracts are attached hereto as Exhibits 1, 2 and 3.

34.   Guardian has performed all of its obligations under its contracts with ACM, Andraos, Mignogna and Derakhshanfar.

11

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

35.   ACM and Andraos breached their contract with Guardian by, inter alia, failing to devote their full time to the business of Guardian, failing to fulfill their obligations to secure and preserve the services of Field Representatives on behalf of Guardian, and inducing Guardian customers and prospective customers to terminate their existing and/or prospective business relationships with Guardian.

36.   Mignogna and Derakhshanfar breached their respective contracts with Guardian by, inter alia, failing to make their principal business activity the solicitation of applications for business with Guardian and failing to fulfill their obligations to abide by Guardian rules and regulations.

37.   As a proximate result of the breaches of these contracts, Guardian has suffered substantial damages, including lost profits in an amount to be determined at trial and the costs and fees incurred in prosecuting this action.

**SECOND CAUSE OF ACTION**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR
DEALING**
**(Against Defendants ACM, Andraos, Mignogna and Derakhshanfar)**

38.   Guardian hereby incorporates by this reference paragraphs 1 to 37 of this Complaint.

39.   Inherent in the contracts between Guardian, on one hand, and ACM, Andraos, Mignogna and Derakhshanfar, on the other, are covenants of good faith and fair dealing whereby ACM, Andraos, Mignogna and Derakhshanfar are required to act

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

in the best interests of Guardian and to refrain from engaging in any conduct that would

deprive Guardian of the benefits of these contracts.

40.   Irrespective of whether the conduct of ACM, Andraos Mignogna and

Derakhshanfar may constitute a literal breach of their respective contracts with

Guardian, each of these defendants wrongfully deprived Guardian of its right to enjoy

the benefits of these contracts and thereby breached their implied covenants of good

faith and fair dealing.

41.   As a proximate result of the breaches of these covenants of good faith and

fair dealing, Guardian has suffered substantial damages, including lost profits in an

amount to be determined at trial and the costs and fees incurred in prosecuting this

action.

**THIRD CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(Against Defendants ACM and Andraos)**

42.   Guardian hereby incorporates by this reference paragraphs 1 to 41 of this

Complaint.

43.   ACM and Andraos owed fiduciary duties to Guardian, by virtue of their

General Agent and General Agency relationship with Guardian.  ACM and Andraos

committed to obligations of trust and confidence to Guardian, whereby they committed

to act solely in the best interests of Guardian, to exclusively pursue Guardian's business

interests, to nurture and preserve Guardian's relationships with Field Representatives,

and to hold monies in trust for Guardian.

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

44.   By engaging in the conduct alleged herein, including but not limited to seeking advance compensation ACM and Andraos knew would never be earned, and encouraging policyholders to cancel and obtain refunds on their policies by telling them to reject the policy on a "first look" basis, ACM and Andraos breached their fiduciary obligations to Guardian.

45.   As a proximate result of the breaches of their fiduciary duties, Guardian has suffered substantial damages, including lost profits in an amount to be determined at trial and the costs and fees incurred in prosecuting this action.

46.   Guardian is informed and believes that ACM and Andraos performed the foregoing acts, conduct and omissions intentionally, maliciously and oppressively, with the intent and design to benefit them at Guardian's expense and to damage Guardian. Thus, Guardian is entitled to recover punitive damages according to proof at trial.

## FOURTH CAUSE OF ACTION
## INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (Against All Defendants)

47.   Guardian hereby incorporates by this reference paragraphs 1 to 46 of this Complaint.

48.   Prior to defendants' conduct as alleged herein, Guardian enjoyed business relationships with its FRs who work out of ACM's office and looked forward to continued prospective economic advantage from these relationships.

49.   Guardian is informed and believes, and on that basis alleges, that defendants

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Andraos, ACM and Union Central requested, induced, and/or directed Guardian's FRs

working out of ACM, including Mignogna and Derakhshanfar, to terminate their FR

Agreements with Guardian for the purpose of entering into a business relationship

Union Central.

50.   Andraos, ACM and Union Central's conduct was wrongful in that it, among

other things, induced the breach of the FRs' business relationships with Guardian,

violated Andraos's and ACM's fiduciary duties toward Guardian.

51.   Prior to the conduct of the defendants as alleged herein, Guardian enjoyed

the prospect of future business relationships with potential policyholders solicited by its

FRs.

52.   Guardian is further informed and believes, and on that basis alleges, that all

defendants have induced prospective policyholders who have submitted applications to

Guardian to cancel or withdraw those applications.

53.   Defendants' conduct in this regard was wrongful in that it, inter alia, resulted

from the breach of the FRs' contracts with Guardian, violated Andraos's and ACM's

fiduciary duties toward Guardian, and was accomplished through fraud and/or negligent

misrepresentation.

54.   As a direct and proximate result of Defendants' wrongful acts alleged

herein, Guardian has lost and will continue to lose policyholders, annuitants, and

insurance and annuity applications and the premiums and other economic benefits

associated with those insurance policies and annuities, in additional to other monetary

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

damages.  Guardian will prove the exact amount of these damages at trial.

55.   Guardian is further entitled to an injunction enjoining Defendants from any further solicitation of Guardian's policyholders, annuitants, and insurance and annuity applicants, and any solicitation of Guardian's FRs.

56.   By interfering with Guardian's relationships with its FRs and policyholders, and in causing Guardian to pay commissions, Defendants consciously disregarded Guardian's rights and interests and acted with malice, oppression and fraud toward Guardian.  Therefore, Guardian is entitled to punitive damages.

## FIFTH CAUSE OF ACTION
## INTERFERENCE WITH CONTRACT
## (Against All Defendants)

57.   Guardian hereby incorporates by this reference paragraphs 1 to 56 of this Complaint.

58.   As the General Agent and the General Agency entity, Defendants Andraos and ACM are, and at all relevant times were, aware of the contracts between the FRs and Guardian.  Union Central was and is also aware of the contracts between the FRs and Guardian.

59.   Guardian is informed and believes, and on that basis alleges, that Andraos, ACM and Union Central requested, induced, and/or directed FRs working out of the ACM office, including Mignogna and Derakhshanfar, to terminate their FR Agreements with Guardian for the purpose of entering into a business relationship with Union Central.

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

60. As a result of Andraos, ACM and Union Central's request, inducement, and/or direction, twenty-three of Guardian's FRs, including Mignogna and Derakhshanfar, have terminated their FR Agreements with Guardian.

61. As the General Agent and the General Agency entity, Andraos and ACM are, and at all relevant times were, aware of certain contracts between Guardian and its policyholders. As FRs, Mignogna and Derakhshanfar are, and at all relevant times were, aware of the contracts between Guardian and its policyholders. Union Central was and is also aware of the contracts between Guardian and its policyholders.

62. Guardian is informed and believes, and on that basis alleges, that Defendants requested, induced, and/or directed Guardian policyholders to surrender their existing policies. Guardian is informed and believes, and on that basis alleges, Mignogna and Derakhshanfar may take and/or have taken actions to recommend that the policyholders replace their existing policies with Guardian. Andraos, ACM and Union Central knew or should have known of this conduct and permitted it to Guardian's detriment.

63. As a direct and proximate result of Defendants' wrongful acts alleged herein, Guardian has lost and will continue to lose policyholders, annuitants, and insurance and annuity applications and the premiums and other economic benefits associated with those insurance policies and annuities, in additional to other monetary damages. Guardian will prove the amount of these damages at trial.

64. Guardian is further entitled to an injunction enjoining Defendants from any further solicitation of Guardian's policyholders, annuitants, and insurance and annuity

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

applicants, and any solicitation of Guardian's Field Representatives.

65.   In interfering with Guardian's contracts with its FRs and policyholders, Defendants consciously disregarded Guardian's rights and interests and acted with malice, oppression and fraud toward Guardian.   Therefore, Guardian is entitled to punitive damages.

## SIXTH CAUSE OF ACTION
## MISAPPROPRIATION OF TRADE SECRETS
### (Against All Defendants)

66.   Guardian incorporates by reference as though set forth in full the allegations in Paragraphs 1 through 65.

67.   Information regarding Guardian's policyholders, including but not limited to personal identifying information, amounts and types of coverage, premium amounts, medical history, purchasing trends, dependent information, personal financial information, policyholder lists, and the like, is not generally known to the general public or to other persons who can obtain economic value from its disclosure.   This information derives independent economic value from being not generally known to the public in that it identifies persons who have a particular need for the insurance and annuity products Guardian offers and includes information regarding these persons' specific needs for such products.  This information allows a competitor to direct its sales efforts to the identified persons, and to the specific needs of these persons.

68.   Guardian engages in reasonable steps to ensure the secrecy of this information through advising their General Agents and FRs in policy manuals, training

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

sessions, and other communications of the confidential, proprietary, and secret nature of this information.  Guardian also has its General Agents and Field Representatives execute agreements not to use this information to induce or attempt to induce any policyholder or annuitant of Guardian to lapse, cancel, or replace any insurance policy or annuity with Guardian.

69.    Guardian is informed and believes, and on that basis alleges, that Andraos, ACM, Mignogna and Derakhshanfar have disclosed Guardian's policyholder, annuitant, and insurance and annuity applicant information to one or more representatives of Union Central, and/or have threatened to disclose the subject information to further Union Central, and/or otherwise use this information to solicit Guardian's policyholders, annuitants, and insurance and annuity applicants to purchase competing insurance and annuity products from Union Central.  Union Central is a direct competitor of Guardian.

70.    Guardian is informed and believes, and on that basis alleges, that at the time of their disclosure and/or use, Defendants knew or had reason to know that their knowledge of the trade secret information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

71.    As a direct and proximate result of Defendants' wrongful disclosure and/or use of Guardian's confidential, proprietary and trade secret information, Guardian has lost and will continue to lose policyholders, annuitants, and insurance and annuity applicants and the premiums and other economic benefits associated with those insurance policies and annuities.  Defendants' future disclosure of the subject information to further

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Union Central representatives, and/or use of this information to solicit Guardian's policyholders, annuitants, and insurance and annuity applicants to purchase competing insurance and annuity products from Union Central will result in the irreparable harm of continued loss of policyholders, annuitants, and insurance and annuity applicants and the premiums and other economic benefits associated with those insurance policies and annuities.

72.    As a direct and proximate result of Defendants' wrongful acts alleged herein, Guardian has been damaged in an amount equal to the premiums and other economic benefits associated with the subject insurance policies and annuities both now and in the future, in additional to other monetary damages.  Guardian will prove the exact amount of these damages at trial.

73.    In addition, Guardian has suffered irreparable harm as a result of Defendants' continued disclosure and/our use of Guardian's confidential, proprietary, and trade secret information, and as such, Guardian reserves the right to seek equitable relief in the form a temporary restraining order and preliminary injunction enjoining Defendants from any further disclosure and/or use of Guardian's trade secret information.

74.    When engaging in the misappropriation of Guardian's trade secrets, Defendants consciously disregarded Guardian's rights and interests and acted willfully and with malice, oppression and fraud toward Guardian.  Therefore, Guardian is entitled to exemplary damages and attorneys' fees.

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## SEVENTH CAUSE OF ACTION
## FRAUD
## (Against Defendants ACM, Andraos, Mignogna and Derakhshanfar)

75.     Guardian hereby incorporates by this reference paragraphs 1 to 74 of this Complaint.

76.     ACM, Andraos, Mignogna and Derakhshanfar's conduct with respect to the submission of policies under the GOM program at the end of their tenure with Guardian constituted fraud, as they knew that, in light of their imminent departures, they could not earn the commissions, overrides and expense reimbursements they were paid, and that Guardian would not collect the premiums on which those payments were based, and they further encouraged policyholders to cancel and obtain refunds on their policies by telling them to reject the policy on a "first look" basis.

77.     ACM, Andraos, Mignogna and Derakhshanfar's misrepresentations were material, as Guardian would not have paid the commissions, overrides and credited expense reimbursements on the policies if it had known of Defendants' misconduct.

78.     ACM, Andraos, Mignogna and Derakhshanfar intended that Guardian rely upon their misrepresentations, and Guardian did so rely.

79.     As a direct and proximate result of ACM, Andraos, Mignogna and Derakhshanfar's wrongful acts, Guardian lost commission payments, overrides and expense reimbursements that were made but unearned, premiums and other economic benefits associated with those insurance policies and annuities, in additional to other monetary damages. Guardian will prove the exact amount of these damages at trial.

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

80.     In committing the fraudulent acts alleged herein, Defendants consciously disregarded Guardian's rights and interests and acted with malice, oppression and fraud toward Guardian.  Therefore, Guardian is entitled to punitive damages.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
## (Against Defendants AMC, Andraos, Mignogna and Derakhshanfar)

81.     Guardian hereby incorporates by this reference paragraphs 1 to 80 of this Complaint.

82.     ACM, Andraos, Mignogna and Derakhshanfar's conduct with respect to the submission of policies under the GOM program, and by encouraging policyholders to cancel and obtain refunds on their policies by telling them to reject the policy on a "first look" basis, constitutes negligent misrepresentation.

83.     ACM, Andraos, Mignogna and Derakhshanfar's misrepresentations were material, as Guardian would not have paid the commissions, overrides and credited expense reimbursements on the policies if it had known of Defendants' misconduct.

84.     ACM, Andraos, Mignogna and Derakhshanfar intended that Guardian rely upon their misrepresentations, and Guardian did so rely.

85.     As a direct and proximate result of ACM, Andraos, Mignogna and Derakhshanfar's wrongful acts, Guardian lost commission payments, overrides and expense reimbursements that were made but unearned, premiums and other economic benefits associated with those insurance policies and annuities, in additional to other

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

monetary damages.  Guardian will prove the exact amount of these damages at trial.

## NINTH CAUSE OF ACTION
## CONVERSION
### (Against Defendants ACM, Andraos, Mignogna and Derakhshanfar)

86.    Guardian incorporates by reference as though set forth in full the allegations in Paragraphs 1 through 85.

87.    Guardian is informed and believes that Defendants have converted Guardian's property to their own use, including but not limited to, files on each of Guardian's existing insurance policyholders and annuitants, files on each of Guardian's FRs who worked out of Andraos's and ACM's office, files on applicants for Guardian's insurance and annuity products, and additional information regarding prospective purchasers of Guardian's insurance and annuity products, for the benefit of themselves and to gain an unfair competitive advantage.

88.    As a proximate result of Defendants' improper conduct, Guardian has suffered substantial damages, including lost profits in an amount to be determined at trial and the costs and fees incurred in prosecuting this action.  Defendants should forfeit any and all compensation or economic benefit of any type that they obtained as a result of their wrongful conduct.

89.    Guardian's total damage is presently unascertainable, however Guardian believes it is in excess of the jurisdiction of this Court.  Damages continue to accrue.

90.    Guardian is informed and believes that Defendants performed the foregoing acts, conduct and omissions intentionally, maliciously, and oppressively, with the intent

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

and design to benefit themselves at Guardian's expense and to damage Guardian.  Thus, Guardian is entitled to recover punitive damages, according to proof at trial.

## TENTH CAUSE OF ACTION
## CALIFORNIA BUSINESS & PROFESSIONS
## CODE §§ 17200, ET SEQ.
## (Against All Defendants)

91.    Guardian incorporates by reference as though set forth in full the allegations in Paragraphs 1 through 90.

92.    The aforementioned wrongful conduct by Defendants, and each of them, constitutes unfair business practices in violation of California Business & Professions Code §§17200 *et seq*.

93.    As a proximate result of Defendants' improper conduct, Guardian has suffered substantial damages, including lost profits in an amount to be determined at trial and the costs and fees incurred in prosecuting this action.  Defendants should forfeit any and all compensation or economic benefit of any type that they obtained as a result of their wrongful conduct.

94.    Guardian's total damage is presently unascertainable, however Guardian believes it is in excess of the jurisdiction of this Court.  Damages continue to accrue.

95.    Guardian is informed and believes that Defendants performed the foregoing acts, conduct and omissions intentionally, maliciously, and oppressively, with the intent and design to benefit themselves at Guardian's expense and to damage Guardian.

24

## **PRAYER FOR RELIEF**

NOW, THEREFORE, Guardian PRAYS FOR RELIEF AS FOLLOWS:

1.    For damages according to proof;

2.    For an order requiring defendants, and each of them, to disgorge all moneys that they have wrongfully obtained as a result of the foregoing alleged wrongful conduct;

3.    For injunctive relief as set forth herein;

4.    For exemplary and/or punitive damages;

5.    For reasonable attorneys fees and costs of suit; and

6.    For such other relief as the Court may deem proper.


Dated: April/0, 2008                    Respectfully submitted,

                                        JACKSON LEWIS LLP

                                        By: _____

                                        Thomas G. Mackey
                                        Jennifer B. Hodur
                                        Attorneys for Plaintiff The Guardian
                                        Life Insurance Company of America

25

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

EXHIBIT "1"

## AMENDMENT TO AGREEMENT OF GENERAL AGENCY

It is hereby mutually agreed that the Agreement of General Agency between **_Andraos Capital Management and Insurance Services_** (The Principal) and The Guardian Life Insurance Company of America (the Company) bearing an original effective date of **_January 1, 2003_** shall be amended as follows:

1.    The effective date of this Amendment shall be:    **February 1, 2006**

2.    **The territory contained in Section I – Appointment and Territory shall be changed to The State of California.**

3.    All other provisions of said Agreement of General Agency shall remain in full force and effect.

In Witness Whereof the parties hereto have signed this Amendment in triplicate on this _____8th_____ day of ____February____ 2006.

_____    
Witness

_____    
Witness

_____    
Principal

_____    
Company

filename:\amend

-26-

## SECTION 1

APPOINTMENT – AUTHORITY AND DUTIES OF PRINCIPAL

(A) APPOINTMENT AND TERRITORY

The Company hereby appoints the Principal as of the effective date as General Agent of its Agency at **Glendale, California**

referred to as the Office.  His territory shall be:   **The State of California.**

This territory is not exclusive as the company may at its sole discretion open additional offices within the territory.

(B) Authority and Duties

(1)   The principal shall devote his full time to developing and managing the Agency and the business of the Company in his territory. He shall have the authority to appoint agents and brokers within his territory, subject to the approval of the Company.  He shall aid the Company in securing the services of Field Representatives in his territory and he shall have the authority with the concurrence of the Company to terminate the services of a Field Representative assigned to his office as provided in the Field Representative's Agreement with the Company.

(2)   The Principal, his agents, brokers and Field Representatives (herein sometimes referred to as Producers) shall have the right to collect money upon the conditional receipt forms attached to applications for policies and contracts of the Company in accordance with the Company's rules and to collect the initial premium specified in such policies and contracts.  He shall be responsible to the Company for all conditional receipts thus detached from applications.  All money received for the Company by the Principal, or any of his employees, agents, brokers or Field Representatives shall be treated by him as trust funds.

The Principal shall turn over immediately to the Company all funds belonging to the Company which come into his possession or the possession of his producers.  He shall have no authority whatsoever to negotiate any financial instruments made payable to Guardian Life or any of its subsidiaries and is not authorized to request that any negotiable instruments be made payable to him personally or to any entity with which he may be affiliated.  Cash is included in the definition of negotiable instruments.

Section 1 – Page 1

## AGREEMENT OF GENERAL AGENCY

PARTIES:     COMPANY – THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, A CORPORATION INCORPORATED UNDER THE LAWS OF THE STATE OF NEW YORK.

PRINCIPAL –     **Andraos Capital Management and Insurance Services**

EFFECTIVE DATE – **January 1, 2003**

THIS AGREEMENT is made between the parties for an indefinite period.
It may be terminated as stated in Section 5.  It includes the following sections and appendices:

| SECTION OR APPENDIX | GENERAL DESCRIPTION |
|---|---|
| Section 1 | Appointment, territory, authority and duties |
| Section 2 | Overriding commissions, payment rules |
| Section 3 | Collection fees defined, method of payment |
| Section 4 | Expense Allowances |
| Section 5 | Termination provisions, compensation after termination |
| Section 6 | Miscellaneous provisions |
| Section 7 | Variable Compensation |
| Appendix A | Agreement of Agency (Full Time Agent's Agreement) |
| Appendix B | Schedule of producer commissions – Individual Life |
| Appendix C | Schedule of producer commissions – Pension Trust |
| Appendix D | Schedule of producer commissions – Disability Income Insurance |
| Appendix E | Schedule of producer commissions – Group Insurance |
| Appendix F | Overriding commission schedules |
| Appendix G | Schedule of Expense Allowances |
| Appendix H | Special Post – Termination Compensation |

IN WITNESS WHEREOF, This Agreement has been signed in two copies by the Principal and by an authorized officer of the Company on this _____ day of _____ 2002.

In the presence of THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA

In the presence of

_____

Authorized Company Officer

In the presence of

_____

Principal

J:\wpdocs/GAContracts/GA Contract (1/2003)

-28-

# SECTION 1

## APPOINTMENT – AUTHORITY AND DUTIES OF PRINCIPAL

### (A) APPOINTMENT AND TERRITORY

The Company hereby appoints the Principal as of the effective date as General Agent of its Agency at **Glendale, California**

referred to as the Office.  His territory shall be:  **Los Angeles, Ventura, Santa Barbara, San Luis Obispo, Kern, Orange, Riverside, San Bernadino and San Diego in the State of California.**

This territory is not exclusive as the company may at its sole discretion open additional offices within the territory.

### (B) Authority and Duties

(1)     The principal shall devote his full time to developing and managing the Agency and the business of the Company in his territory. He shall have the authority to appoint agents and brokers within his territory, subject to the approval of the Company.  He shall aid the Company in securing the services of Field Representatives in his territory and he shall have the authority with the concurrence of the Company to terminate the services of a Field Representative assigned to his office as provided in the Field Representative's Agreement with the Company.

(2)     The Principal, his agents, brokers and Field Representatives (herein sometimes referred to as Producers) shall have the right to collect money upon the conditional receipt forms attached to applications for policies and contracts of the Company in accordance with the Company's rules and to collect the initial premium specified in such policies and contracts.  He shall be responsible to the Company for all conditional receipts thus detached from applications.  All money received for the Company by the Principal, or any of his employees, agents, brokers or Field Representatives shall be treated by him as trust funds.

The Principal shall turn over immediately to the Company all funds belonging to the Company which come into his possession or the possession of his producers.  He shall have no authority whatsoever to negotiate any financial instruments made payable to Guardian Life or any of its subsidiaries and is not authorized to request that any negotiable instruments be made payable to him personally or to any entity with which he may be affiliated.  Cash is included in the definition of negotiable instruments.

Section 1 – Page 1

(3)   He shall have no power or authority other than that expressly granted in this Agreement.  He shall have no power or authority to make, alter or discharge any contract in the name of the Company; or, to bind the Company by any promise or statement; or, to make, accept or endorse notes; or, to incur any liability on behalf of the Company; or, to waive a forfeiture; or, to waive, alter or amend the terms or conditions of any policy or other contract to which the Company is a part or, to extend the time for the payment of a premium.

(4)   He shall comply with and be bound by the rules and regulations of the Company now in force or as they hereafter may be amended or implemented including but not limited to those contained in the Company's "Agents Manual", "Instructions for Agency Offices" and "Field Representatives' Plan".  Further, the Principal shall be responsible for ensuring the compliance of the agents and brokers in the Principal's office with the policies and procedures of the Company and its affiliates.

(5)   All books and records kept by the Principal in connection with the business of the Company are the property of the Company and shall be returned on demand.

(6)   The Principal shall be under a satisfactory bond of indemnity in a form and amount to be approved by the Company.

(7)   The Principal shall make all commission payments to agents and brokers assigned to the Principal's office on a prompt and timely basis.

Section 1 – Page 2
d:/wpdocs/GAContracts/GA Contract (1/2003)

## SECTION 2

### COMMISSIONS

The commission payments made in accordance with provisions of this Section and the attached Appendices, together with Collection Fees and Variable Compensation, if any, and the Expense Allowances provided for in other sections, shall constitute full compensation to the Principal for his services and his expenses under this Agreement.  No commissions, compensation or allowances shall be allowed, except as herein provided.

In addition, the Company will reimburse the Principal for all commissions, persistency fees and persistency payments to producers that he is contractually obligated to pay and does pay to such producers under contracts approved by the Company, but, in no event, in excess of those stated in this section and in the Appendices contained herein.

### (A) GENERAL

Whenever in this contract reference is made to Life insurance or Disability Income insurance, such reference shall not include Group insurance, unless specifically mentioned.

The New York Insurance Law prohibits the Principal from paying commissions to his producers in excess of those stated in the Appendices attached herein.  A duplicate original of each contract between the Principal and his producers who are eligible to receive payments of commissions, supervisory compensation, expense allowance or any other emoluments shall be filed with the Company.

### (B) COMPENSATION FOR PERSONAL PRODUCTION OF THE PRINCIPAL

For Life and Disability Income business issued on applications submitted by the Principal personally as an agent of record, the Company will pay to the Principal commissions in accordance with the Agreement of Agency (Appendix A) and Appendices attached herein.  The commission payment rules of such Agreement of Agency and supplements apply.

Commissions on Group insurance and Group annuity business issued on applications submitted by the Principal personally as agent of record will be payable in accordance with the commission payment rules contained in Appendix E attached herein.

The provision for the payment of persistency fees on Life insurance, as stated in the Agreement of Agency (Appendix A), does not apply with respect to the business submitted by the Principal personally under this Agreement or through a brokerage contract of any type including a corporate broker contract.  Persistency payments and Variable Renewal Compensation will be made, if earned, according to Appendix D on the Disability Income business produced by the Principal as agent of record.

Section 2 – Page 1

## (C) OVERRIDING COMMISSIONS

During the continuance of this Agreement, the Principal shall receive from the Company overriding commissions on Life insurance and annuities, Disability Income insurance, Group insurance and Group annuities on such business produced by the Principal as agent of record and by agents or brokers under an Agreement of Agency or Brokerage Agreement with the Principal and by Field Representatives assigned to the Principal's office, in accordance with the overriding commission schedules contained in Appendix F attached herein and the following General Payment Rules. Overriding commissions payable to the Principal by the Company after termination of this Agreement shall be made in accordance with the provisions of Section 5 and Section 6 attached herein.

Disability Income insurance overrides and overrides on certain life insurance products specified in Appendix F, while paid by the Guardian Life Insurance Company of America, are generated on business sold through Berkshire Life Insurance Company of America (BLICoA herein), a wholly owned subsidiary of The Guardian Life Insurance Company of America. Overrides generated on the life insurance products sold through BLICoA are not included with other overrides of the Principal used in determining various fringe benefits of the Principal made available by the Company.

## (D) GENERAL PAYMENT RULES

The Payment to the Principal of such commissions is subject to the following rules:

(1)     Overriding commissions are payable on premiums actually collected and accounted for in cash or by check only when such check has been honored at the Home Office of the Company during the continuance of this Agreement on policies issued and paid for pursuant to this Agreement upon applications solicited on or after the effective date of this Agreement.

(2)     Overriding commissions on Life Insurance premiums for supplemental benefits shall by paid at the same rate as is then payable on the premium then due on policy to which supplemental benefits are attached.

(3)     No overriding commissions shall be paid on:
   (a)     temporary extra premiums;
   (b)     premiums for interim term Life Insurance;
   (c)     any reserve adjustment paid to the Company on any change of policy form;
   (d)     the payment necessary to make a policy paid-up either by application of dividends or otherwise;
   (e)     on premiums paid on exchange of Pension Trust Series policies and contracts at retirement age according to the special exchange rider attached to such policies and contracts;
   (f)     nor on Convertible Term-4 (CT-4) policies.

(4)     Overriding commissions will be paid if and as they accrue on premiums paid by policy loans or application of dividends.

(5)     On premiums paid in advance, other than for Disability Income policies, the overriding commissions will not be paid until the contractual due date of such premiums.

Section 2 – Page 2

d:/wpdocs/GAContracts/GA Contract (1/2003)

(6)   All commissions paid on premiums refunded by the Company for any reason shall be repaid to Company.  If not so repaid such commissions shall constitute an indebtedness of the Principal to the Company.

(7)   Overriding commissions on premiums paid on any form of reinstatement, on conversion or renewal of Term Insurance and Annuities or on increase in Disability Income Premiums on account of change in coverage, as well as designation of the person entitled thereto, shall be paid only in accordance with the Company's rules in effect when the reinstatement, conversion, renewal or change is made.

(8)   No overriding commissions shall be paid on premiums on policies issued as the result of the conversion of Group Insurance of any kind.

(9)   No renewal overriding commissions shall be paid for any policy year beyond the premium paying period.

(10)  For policies of insurance or annuities other than those mentioned in the preceding schedule of overriding commissions, the overriding commission rates will be special quoted upon request to the Company.

(11)  Commissions on a new policy which is a replacement of previously issued insurance in this Company will be paid only in accordance with the Company rules in effect when the replacement is issued.

(12)  In those instances where "Benchmark Gross Level Premium" (as defined in the New York Insurance Law) should be less than actual first policy year basic policy premiums paid, the first year commissions shall determined by applying first year commission rates to "Benchmark Gross Level Premiums" instead of the actual first policy year basic policy premiums paid.

(13)  If it so elects, the Company may administer and service any Pension Trust previously administered and serviced by the Principal.  In that event, a service fee shall be paid to the Company by the Principal.

Section 2 – Page 3

## SECTION 3

COLLECTION FEES

Collection fees are one percent (1%) of premium paying base policy renewal life insurance premiums on applicable life insurance policies in any and all policy years on life insurance policies being serviced by the Principal under this Agreement but not produced under this Agreement or under previous Agreements in which one or more of the Principals under this Agreement was a member. Collection fees are not generated on Guaranteed Issue Whole Life, Supplemental Whole Life, Resource Life, Yearly Renewable Term, LifeSpan and any BLICoA life insurance renewal premiums.

Section 3 – Page 1

d:\wpdocs/GAContracts/GA Contract (1/2003)

## SECTION 4

## EXPENSE ALLOWANCES

### A. GENERAL

Part of the Principal's remuneration is called "Expense Allowance Payments." It is defined and limited by (1) calculations based on Appendix G attached and a part hereof, and (2) the maximum set by Insurance Department "Section 4228".

### B. SECTION 4228 LIMITS

Section 4228 where applicable in any calendar year requires that no direct or indirect expense allowance payments as defined therein (and variable compensation earnings as outlined in Section 7 during specified timeframes) shall be made, which together with first year life insurance commissions including Field Representative Life Production Credits at $13.75 per 1,000, would be in excess of specified percentages of base first year life insurance premiums. The base first year premiums, first year commissions and expense allowance payments applicable to Guaranteed Issue Whole Life, Supplemental Whole Life, Resource Life, Yearly Renewable Term, LifeSpan and BLICoA life insurance products shall be excluded from the Section 4228 calculations. The Section 4228 limits operative under this Agreement shall be as follows:

| Year | Column A<br>%s of First-Year Life<br>Cash Premium* | Column B<br>%s of First-Year Life<br>Commissions | Column C<br>%s of First Year<br>Premiums &<br>Commissions |
|------|------|------|------|
| 2005 | 94% | 20% | 94% + 20% |
| 2006 | 94% | 16% | 94% + 16% |
| 2007 | 94% | 12% | 94% + 12% |
| 2008 | 94% | 8% | 94% + 8% |
| 2009 | 94% | 4% | 94% + 8% |
| 2010 &<br>thereafter | 94% | N/A | 94% + 4%<br>94% |

Section 4 – Page 1

d:\wpdocs/GAContracts/GA Contract (1/2003)

## SECTION 5

### TERMINATION OF AGREEMENT

### (A) CONDITIONS OF TERMINATION

This Agreement shall terminate immediately without notice under any of the following conditions:

1.  On the bankruptcy of the Principal.

2.  If the Principal is a sole proprietor, on his death or retirement

3.  If the Principal is a corporation or a partnership, on its dissolution or loss of majority control by the Present principals or the death or retirement of a partner or an officer actively employed in the business of the General Agency.

Either the Company or Principal may terminate this Agreement without cause upon written notice to the other party except that in the case of Principals with ten or more years of service, as measured from the effective date for Life Insurance outlined in (B) below, the Company agrees that before any termination without cause becomes effective, it will notify the Principal of specific reasons for the termination and the Principal will have up to six months to cure, to the Company's satisfaction, any deficiencies in performance that may be given as reasons for termination by the Company.  This six months notice to the Principal before a termination without cause becomes effective is provided to the Principal as an accommodation by the Company and is not intended to modify the Principal's status as an independent contractor.

### (B) COMPENSATION AFTER TERMINATION OF THIS AGREEMENT

For purposes of determining the application of termination deductions contained in this Section 5, the effective date of this Agreement shall be considered to be **_February 1, 1999_** for Life Insurance and **_February 1, 1999_** for Disability Income and Group Insurance.

1.  If this Agreement is terminated by reason of the death or the total and permanent disability of the Principal or a partner or officer of the Principal at any time, the life insurance termination deductions stated below in (a) shall not be imposed.

2.  If the Agreement terminates within or at the end of the first contract year, other than by death or total and permanent disability, no renewal overriding commissions on life and disability income insurance shall be payable to the Principal.  If this Agreement terminates within the first five contract years, no first year or renewal overriding commissions on Group insurance shall be payable to the Principal.

Section 5 – Page 1

d:\wpdocs/GAContracts/GA Contract (1/2003)

*Excludes personal production of Principal whose expense allowance payments and first year commissions shall be limited at all times to no more than 86% of his/her basic first year life cash premium.

The Section 4228 limits outlined above shall be reduced by agency expenses paid for directly by the Company for the Principal as outlined in (A) (5) of Appendix G.

Section 4 – Page 2

d:\wpdocs\GAContracts\GA Contract (1/2003)

3.   If this Agreement terminates for any reason other than death, total and permanent disability or retirement after it has been in force for more than one year, the Life and Disability Income insurance overriding commissions as stated in Appendix F, less the termination deductions stated below in (a), shall be payable to the Principal.   If this Agreement terminates for any reason after it has been in force for five years, the group insurance overriding commissions as stated in Appendix F, less the termination deduction stated below, shall be payable to the Principal or his lawful representative.

4.   No termination deductions on life and Disability Income insurance shall be imposed on the premiums of the first policy year.

5.   The termination deductions for Life Insurance and Annuities are equal to percentages of the premiums on which renewal overriding commissions are earned (but in no event more than such overriding commissions) based on the contract year of the Principal's termination under this Agreement (counted from the effective date stated in this Section 5) in accordance with the schedules outlined in paragraphs (a) and (b) below:

(a)   For termination for any reason other than death, permanent disability or retirement, the termination deductions are as follows:

| Termination within or at the end of Contract Year | Termination Deduction Excl. PUA/PUI/PTRA # | Termination Deduction For PUA/PUI/PTRA |
|---|---|---|
| 2 | 2.0% | .025% |
| 3 | 2.0% | .025% |
| 4 | 1.8% | .025% |
| 5 | 1.7% | .025% |
| 6 | 1.6% | .025% |
| 7 | 1.5% | .025% |
| 8 | 1.4% | .025% |
| 9 | 1.2% | .025% |
| 10 & over * | 1.0% | .025% |

*Deductions shall be waived if the Principal or a Partner, Officer or Member of the Principal shall be age 65 or older and have been a General Agent for 10 or more years as of the date of termination.

Section 5 – Page 2

d:\wpdocs\GAContracts/GA Contract (1/2003)

(b)    For termination by reason of retirement, the termination deductions are as follows:

| Retirement Within Contract Year | Termination Deduction for RETIREMENT PRIOR TO AGE 65 excluding PUA/PUI/PTRA # | Termination Deduction for RETIREMENT PRIOR TO AGE 65 FOR PUA/PUI/PTRA |
|---|---|---|
| 11 | * | * |
| 12 | * | * |
| 13 | * | * |
| 14 | * | * |
| 15 | * | * |
| 16 | 1.0% | .025% |
| 17 | 1.0% | .025% |
| 18 | 1.0% | .025% |
| 19 | 1.0% | .025% |
| 20+ | 0% | 0% |

*Not eligible for Retirement

#    In lieu of rates shown in these schedules, 1.0% shall be applicable policy years two through ten to Guaranteed Issue Whole Life and Supplemental Whole Life business. Only 40% of the standard rates shown in the schedules shall be applicable policy years two through five to Resource Life. Only 20% of the standard rates shown in the schedules shall be applicable policy years two through five and 50% of the standard rates shown in the schedules shall be applicable policy years six through ten to Yearly Renewable Term and LifeSpan business.

It is understood and agreed that the percentage deductions contained in paragraphs (a) and (b) above shall not be greater than those that would have applied under a prior Agreement between the Principal and the Company.

6.    The termination deductions for Disability Income Insurance are equal to the following percentages of the premiums on which renewal overriding commissions are earned (but in no event more than the applicable overriding commissions):

| Disability Income Insurance Policy Years | Termination Deductions |
|---|---|
| 2 – 10 | 0% on all plans except as follows:<br><br>2% on AH55 and NC56<br>1% on NC97 |
| 11 & Later | 3% on all plans except as follows:<br><br>5% on AH55 and NC56<br>2.5% on NC97 |

Section 5 – Page 3
d:\wpdocs/GAContracts/GA Contract (1/2003)

## (C) GENERAL PROVISION

In the event of the termination of this Agreement, if there are any commissions due or to become due from the Principal to the producers on premiums collected before or after such termination, the Principal hereby authorizes and empowers the Company to pay to such producers, their assigns or their legal representatives all such commissions payable in accordance with the provisions of their respective contracts.

In the case of such termination, the Company shall also pay the Principal commissions on his personal production according to the provisions of the attached Agreement of Agency with Supplements.

Except as stated in subsection (B) of this Section 5 and Appendix H, it is expressly understood and agreed that, after the date of termination of this Agreement, the Principal or his legal representatives shall have no claim to any commissions, collection fees, expense allowances or any other form of compensation.

The Principal covenants and agrees that after termination of this Agreement, whether terminated by the Principal or by the Company, the Principal will not directly or indirectly by or through any partner, agent, employer, or firm on the Principal's behalf, advise, induce or attempt to induce any policy holder or annuitant of the Company or any subsidiary company of the Company to lapse, cancel or replace any insurance policy or annuity of the Company or of any subsidiary company.   These prohibitions shall last for a period of one (1) year following the termination of this Agreement and in the event the Principal breaches this provision, the Principal agrees that the Company may compel the Principal's compliance with this provision by injunction, or by any other remedy at law or equity, or by any other remedy under this contract.

Section 5 – Page 5
d:/wpdocs/GAContracts/GA Contract (1/2003)

## SECTION 6

MISCELLANEOUS PROVISIONS

(A) COMPANY LIEN IN CASE OF INDEBTEDNESS

Any and all indebtedness to the Company and affiliates is due and payable in cash on demand to the Company by the Principal or his estate, executors, administrators or assigns and, in any event, on the termination of this Agreement of Agency.

The Company's books and records shall constitute evidence of such indebtedness.  Such indebtedness arises when the Company lends funds or becomes liable for them on the Principal's behalf or as described by additional written agreements between the Company and the Principal, and shall include but not be limited to the following:

(a)   Loans against commissions made to the Principal either for his own account or for the purpose of financing Field Representatives, Full Time Agents or Brokers as directed by separate agreements between the Principal and the Company.

(b)   Commissions reclaimed in accordance with the provisions of Section 2 and Appendix F of this Agreement.

(c)   The liability of the Principal under the terms of rental agreements with the Company for the rental of furniture and equipment, if any.

(d)   The liability of the Principal for salary extensions made to Field Representatives assigned to the Principal's office under the terms of the Agreement contained in the request for such salary extension.

(e)   Liability of the Principal to the Company for operating capital loans as described in a separate promissory note executed by the Principal with the Company.

(f)   To assist the Principal in the conduct of his business and in the execution of this Agreement, the Company may provide the Principal with office space.  In the event the Principal shall be indebted to the Company to the extent of the Company's expense thereof.   On termination of this Agreement, the Principal's license to occupy Company's space and Principal's liability therefore shall terminate.  If upon termination of this Agreement the Principal shall hold the lease to the office space, the Company shall have sixty (60) days to remove its furniture, equipment and records from the premises.

Section 6 – Page 1

d:\wpdocs/GAContracts/GA Contract (1/2003)

Variable Renewal Overriding Commissions based on persistency outlined in Appendix F Part (B) (3) will cease upon the termination of this Agreement for any reason.

Variable Renewal Overriding Commissions based on persistency and volume outlined in Appendix F Part (B) (4) will cease upon the termination of this Agreement for any reason other than by death at any time or by retirement or disability after this Agreement has been in force more than one year.  In the event of such death, retirement or disability, two percent (2%) of the cash Disability Income premiums for policy years six (6) through ten (10) shall be payable to the Principal unless the Principal shall be a qualified Principal as defined in Appendix H of this Agreement in which case the Principal shall be paid fifty percent (50%) of Variable Renewal Overriding Commission based on persistency and volume in lieu of such payments.

7.   The termination deductions for Group Insurance and Group Annuities are percentages of first year and renewal overriding commissions based on the policy years of the group contracts (counted from the effective date of each group policy or contract) and the contract year of the Principal's termination under this Agreement (counted from the effective date stated in this Section 5) as follows:

| Policy Years of Group Contracts | Percentage Deduction of Overriding Commissions at termination for any reason after effective date stated in this Section 5 | | |
|---|---|---|---|
| | Under 5 Years | 5 Yrs Less than 10 Yrs. | 10 Yrs and Thereafter |
| 1 | 100% | 50% | 0% |
| 2 –10 | 100% | 75% | 50% |
| 11+ | 100% | 100% | 100% |

Section 5 – Page 4

d:/wpdocs/GAContracts/GA Contract (1/2003)

The Company has a first lien upon any and all compensation or claim for compensation under this or any prior agreements, as security for payment of any indebtedness due or to become due from the Principal to the Company, or for payment of any financial loss which the Company may suffer or may become liable to suffer by reasons of any fraudulent or dishonest act on the part of the Principal or any attempt thereat. Interest shall be computed on any such indebtedness or loss at the current rate established by the Board of Directors of the Company. If any interest is not paid in cash, it shall annually, on the 31st day of December of each year, be added to and become part of such indebtedness and bear interest at the current rate of interest set by the Company. Upon termination of this Agreement, the indebtedness shall bear interest to the full extent permitted by law.

The said indebtedness is due and payable in cash on demand to the Company without regard to whether any renewal commissions, or the value thereof, may be payable in the future. The payment of all commissions and any and all other payments here under are subject to the indebtedness of the Principal to the Company.

## (B) ASSIGNMENT

No assignment of this Agreement shall be valid except an assignment to the Company. No assignment of commissions or other monies due or to become due hereunder shall be valid unless authorized in advance in writing by the Company on the form it provides for such express purpose.

## (C) PREVIOUS AGREEMENTS

All Agreements heretofore entered into by and between the parties hereto, whether oral or in writing, are hereby released, abrogated, and declared to be null, void and of no effect, except:

(1)     agreements of any liabilities, obligations or any indebtedness of the Principal to the Company and liens created in connection therewith;

(2)     agreements made between the Principal and the Company to the effect that commissions earned by his agents and brokers to be paid by the Company to them after the termination of the Principal's Agreement of Agency with the Company;

(3)     the right to commissions hereafter accruing and earned under any prior agreement between the parties hereto subject to the offsets and counterclaims therein provided is not hereby impaired.

## (D) DEDUCTIONS FROM PAYMENTS

All payments to the Principal are subject to any deductions required by law or authorized by the Principal and agreed to by the Company.

Section 6 – Page 2

d:/wpdocs/GAContracts/GA Contract (1/2003)

## (E) INDEPENDENT CONTRACTOR

Nothing herein contained shall be construed to create the relation of employee and employer between the Principal and the Company.

Within the bounds of the Company's rules and regulations, the Principal shall be free to exercise his own judgement as to the time and place of solicitation within his territory of persons acceptable to the Company, as to the appointment of his agents and brokers within his territory, and as to the general conduct of his business.

All employees of the Office shall be employees of the Principal, except as provided by separate written agreement with the Company. However, all engagements of clerks and other persons and the terms of their continuance in service shall at all times be subject to the approval of the Company.

## (F) FAILURE TO ENFORCE IS NOT WAIVER

Failure or omission of the Company to enforce any of the provisions of this Agreement or the failure or omission of the Company to exercise any of its rights or privileges under this Agreement shall not be deemed a waiver of any such provisions, rights, privileges, or terms. Any modification of any provision of this Agreement shall be made only in writing by an authorized Officer of the Company.

## (G) ENTIRE AGREEMENT

This instrument contains all the agreements and conditions made between the parties hereto whether oral or written. Any additions thereto or alterations or changes in this Agreement or other agreements hereinafter made to be binding, must be in writing signed by both parties.

Section 6 – Page 3

d:/wpdocs/GAContracts/GA Contract (1/2003)

## SECTION 7

VARIABLE COMPENSATION

Notwithstanding the provisions of Section 2, the Company will pay the Principal the following additional compensation while this Agreement remains in force:

Percentages of first year Life and Pension Trust commissions credited to the agency (excluding commissions for Paid-Up Additions riders, Paid-Up Insurance riders, Pension Trust Retirement Annuities, Guaranteed Issue Whole Life, Supplemental Whole Life, Resource Life, Yearly Renewable Term, LifeSpan, BLICoA life insurance products, all overriding commissions and all commissions resulting from the personal production of the Principal (including production of the Principal under a brokerage contract of any kind including a corporate broker contract) as follows:

| PERIOD | | |
|---|---|---|
| FROM | TO | PERCENTAGE OF COMMISSIONS |
| 1/1/01 | 12/31/01 | 18.5% |
| 1/1/02 | 12/31/02 | 12.5% |
| 1/1/03 | 12/31/03 | 9.25% |
| 1/1/04 | 12/31/04 | 6.25% |
| 1/1/05 | 12/31/05 | 3.80% |
| 1/1/06 | 12/31/06 | 2.5% |
| 1/1/07 | 12/31/07 | 1.3% |
| 1/1/08 | 12/31/08 | 0.65% |
| 1/1/09 | 01/31/09 | 0.60% |

Section 7 – Page 1

d:/wpdocs/GAContracts/GA Contract (1/2003)

TYPE B

# AGREEMENT OF AGENCY

**Parties:**   **Principal-**

   **Agent-**

**Effective Date:**

This Agreement is made by and between the Principal and the Agent. The Guardian Life Insurance Company of America, referred to as the Company, is not a party to this Agreement except to the extent of its endorsement. This Agreement shall run for an indefinite period subject to termination at any time by either of the parties by notice in writing, or automatically by termination of the Principal's agreement with the Company.

Wherever the singular form or masculine gender occurs in this Agreement, as to either Principal or Agent, the substitution of the respective plural form is understood in the case of a partnership or feminine gender in the case of a female or neuter gender in the case of a corporation.

(1)  **Appointment.** The Principal appoints the Agent to solicit all forms of insurance coverage included in this Agreement provided he is or may be licensed for the type of coverage solicited. The territory of the Agent shall be wherever he is or may be licensed for the type of coverage solicited. The Agent shall personally witness and transmit to the Company, through the Principal, for its consideration all applications for such forms of policies as may be issued by it, collect the initial premiums, countersign (when necessary) and deliver any policies forwarded to him by the Company through the Principal for that purpose, and shall perform such other duties and services to policyholders and beneficiaries pertaining to the business of the Company as may be required of him.

(2)  **Compensation.** The Principal will pay the Agent commissions as provided under this Agreement on first year and renewal premiums which are actually due, collected and paid in cash to the Company on policies and contracts issued by the Company on applications submitted under this Agreement. Persistency fees on life insurance shall be paid in accordance with the provisions of this Agreement; persistency payments on health insurance shall be paid in accordance with the provisions of the Supplement to Agreement of Agency, Compensation on Health Business. Commissions and persistency payments shall constitute full compensation to the Agent for his services.

**a. First Year and Renewal Commissions.** First Year and Renewal commissions on individual life insurance and annuities, health insurance, pension trust series insurance, group insurance and group annuities will be payable in accordance with the Supplements which are attached to and form a part of this Agreement.

During the continuance of this Agreement and after ten years from the effective date of each group policy, commissions shall be paid to the Agent, only as long as he continues to be recognized by both the policyholder and the Company as the "Agent of Record" under the group policy.

**b. Persistency Fees on Life Insurance.** During the continuance of this Agreement, the Agent may qualify for persistency fees on life business to the extent provided in the following paragraphs.

The amount of persistency fees on life business shall be 2% of the cash premiums thereafter received on premium-paying life insurance policies (including insurance policies of the P.T. series but excluding all annuity contracts) in force in the Company for ten or more years, and issued on applications personally submitted by the Agent under this Agreement, or a prior soliciting agreement, provided no compensation was paid to him on such policies during the first ten policy years in excess of that provided in the appropriate agreement for such years. The cash premium on any policy to which the 2% applies shall include the cash premium for any supplemental

instruments be made payable to the agent personally or to any entity with which the agent may be affiliated. Cash is included in the definition of negotiable instruments.

(9)  **Advertising and Representations**. The Agent shall use no advertising material, prospectus, proposal or representation, either in general or in relation to a particular policy of the Company, unless furnished by the Company or until the consent of the Company thereto shall have first been secured through the Principal. The Agent shall not issue or circulate any illustration, circular, statement or memorandum of any sort misrepresenting the terms, benefits or advantages of any policy issued by the Company or make any misleading statement as to the dividends to be received thereon or as to the financial position of the Company.

(10)  **New Coverages**. In the event the Company has undertaken or shall undertake the writing of types of coverage not mentioned herein, an appropriate amendment to this Agreement shall be made. It shall be effective on written notice to the Agent and shall set forth the commissions payable, conditions of such payment for such business and shall modify any of the provisions of this Agreement necessary to adapt it to the nature of such business.

(11)  **Assignment.** No assignment of this Agreement, or persistency payments hereunder, except to the Principal or the Company, shall be valid. No assignment of any life, disability or group insurance commissions, except to the Principal or to the Company shall be valid, unless authorized in advance in writing by the Principal and the Company.

(12)  **Abrogation of Prior Agreements**. All agreements heretofore entered into by and between the parties hereto, are hereby released, abrogated and declared to be null, void and of no effect, any stipulation contained therein to the contrary notwithstanding, except such agreements or parts thereof relating to:

a. any indebtedness of the Agent to the Principal or the Company and liens created in connection therewith;

b. any liabilities or obligations previously assumed or incurred by the Agent and owing to or running for the benefit of the Principal or the Company and liens created in connection therewith;

c. the obligation of the Company, if requested and agreed to by the Company, that in event of the termination of the Principal's agreement with the Company, the payment of commissions to the Agent be made by the Company to the Agent for the Principal's account,

d. the right to commissions hereafter accruing and earned under any prior agreement between the parties hereto, subject to the offsets and counterclaims therein provided.

(13)  **Authorization by Principal to Pay Agent.** The Principal hereby authorizes and empowers the Company, in the event of the termination of the Principal's agreement with the Company, to pay for his account to the Agent, or his legal representatives, on premiums collected after such termination, such commissions and persistency payments as may thereafter accrue to the Agent under this Agreement in accordance with and subject to all of its terms and conditions, and the payment of such commissions and persistency payments to the Agent by the Company shall constitute a full discharge of the Principal and the Company as to the commissions and payments in question.

# Supplement to Agreement of Agency

## SCHEDULE OF FIRST YEAR AND RENEWAL COMMISSIONS ON LIFE BUSINESS
### (Excludes Policies of P.T. Series)

### Per Cent of Premiums

**Whole Life Plans**
FLEX15 ----------------------------- 55%
Whole Life 100, Whole Life 1000, EstateGuard, Economix ------------ 50%
LifeSpan (initial) --------------------- 40%
Resource Life ------------------------ 20%
LifeSpan (ultimate) ------------------ 15%
Guaranteed Issue Whole Life ------------- 10%
Supplemental Whole Life ---------------- 8%

**Term Insurance**
YRT ------------------- 40%
NCT ------------------- 10%
T-1 & ST-1 ------------- 5%
Level 5/10 ------------- 40%
Level 20 --------------- 50%
Level 30 --------------- 55%

**Riders**
PUA Rider --------------------- 3% } Years
Paid-up Ins. (Rider (m) -------- 3% } 1 - 10

| Premium Paying Period | Limited Payment Life INCL VIP & L-96 | Premium Paying Period | Limited Payment Life INCL VIP & L-96 |
|---|---|---|---|
| 25 Years and Over | 50 | 14 | 39 |
| 24 | 49 | 13 | 38 |
| 23 | 48 | 12 | 37 |
| 22 | 47 | 11 | 36 |
| 21 | 46 | 10 | 35 |
| 20 | 45 | 9 | 32 |
| 19 | 44 | 8 | 30 |
| 18 | 43 | 7 | 25 |
| 17 | 42 | 6 | 20 |
| 16 | 41 | 5 | 15 |
| 15 | 40 | | |

## LIMITATION FOR POLICIES ISSUED AT AGES OVER 70

For policies issued at ages over 70, the first year commission percentage stated above is subject to "120 less the issue age" except for Resource Life. For Resource Life policies issued at ages over 70, the first year commission percentage is subject to "90 less the issue age." For EstateGuard policies, the issue ages for purposes of this paragraph shall be the ages of the younger insureds. No first year commissions in excess of the maximums shall be paid.

RENEWAL COMMISSIONS                                YEARS

| | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| FLEX 15 ----------------- 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% * |
| Whole Life 100, Whole Life 1000, EstateGuard, VIP, L-96, Economix, LifeSpan (ultimate) and Limited Payment Plans ---- 10% | 10% | 10% | 3% | 3% | 3% | 3% | 3% | 3% |
| LifeSpan (initial), YRT ----------- 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |
| Resource Life --------------- 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| NCT ------------------- 5% | 5% | 5% | 5% | 2% | 2% | 2% | 2% | 2% |
| Guaranteed Issue Whole Life ------ 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| Supplemental Whole Life ------- 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% |
| Level 5/10 --------------- 5% | — | — | — | — | — | — | — | — |
| Level 20 ---------------- 15% | 10% | — | — | — | — | — | — | — |
| Level 30 ---------------- 20% | 15% | — | — | — | — | — | — | — |

* Also payable years 11 through 16 inclusive
Level term is sold through Berkshire Life Insurance Company of America (BLICOA), a wholly owned subsidiary. Level term commisions are excluded from commissions used in determining various Fringe Benefit programs made available by the company.

## COMMISSION PAYMENT RULES
### (Life, Health and Pension Trust Business)

(1)   Commissions on premiums paid for benefits supplemental to policies of Insurance shall be paid at the same rate as is then payable on the premium then due on the policy to which the supplemental benefits are attached, excluding paid-up Addition Rider and Paid-up Insurance. Such commission shall be paid to the agent who secured the application for the policy without regard to whether or not he/she is the agent who secured the application for the supplemental benefits.

(2)   For plans, issue ages, and premium paying periods other than those mentioned in the schedules, the commissions will be quoted upon request to the Principal.

(3)   No commissions shall be paid on temporary extra premiums, for interim term life insurance, on premiums waived on death under a combined Waiver of Premium Benefits, nor any cash value or reserve adjustment paid to the Company on any change of policy form, nor upon the payment necessary to make a policy paid-up, either by application of dividends or otherwise, nor on premiums paid for one year term additions or paid up additions. For Pension Trust series policies, no commission will be paid on any "cost of exchange" paid upon exchange of a life policy under its provision entitled "Privilege of exchange for paid-up retirement annuity contract" or upon exchange of a retirement annuity contract under its provision entitled "Privilege of exchange on or before retirement date." For a Health insurance policy issued with a Preliminary Insurance Rider, policy years for the purpose of determining the commission rate will be measured from the beginning of the preliminary insurance period.

(4)   Commissions shall be paid on life and health premiums waived on account of disability or on premiums waived on account of disability under a Combined Waiver of Premium Benefits.

(5)   Commissions will be paid if and as they accrue on premiums paid by policy loans or by application of dividends, or by check when such check has been honored.

(6)   On any premium paid in advance, the commission will not be due until the contractual due date of such premiums.

(7)   Commissions paid on premiums refunded by the Company because of recission or reformation of a contract shall be repaid to the Principal regardless of any resulting litigation or compromise settlement.

(8)   Commissions payable on conversion or renewal of Term Insurance, income Annuities, and Deferred Life Income Contracts, and designation of the Agent entitled thereto, commissions payable on an increase in health premiums on account of a change in the coverage and commissions payable on reinstatement of a policy and the designation of the Agent entitled to any such commissions shall be in accordance with the Company's rules in effect when the conversion, renewal, change or reinstatement is made.

(9)   There shall be an equal division of production credit and agent's commissions between the Agent and the Principal or the Agent and other agents of the Company, on business secured through the joint efforts of such persons unless otherwise agreed by such agents and so indicated on the application for such business.

(10)  The Agent Shall not be entitled to commissions unless his name appears on the application as the soliciting Agent. No commissions shall be paid beyond the premium paying period.

(11)  Commissions on a new policy which is a replacement of previously issued insurance in this Company will be paid only in accordance with the Company rules in effect when the replacement is issued.

(12)  In those instances where "Benchmark Gross Level Premiums" on life insurance policies (as defined in Section 4228 of the New York Insurance Law) should be less than actual first policy year basic policy premiums paid, the first year commissions shall be determined by applying first year commission rates to "Benchmark Gross Level Premiums" instead of the actual first policy year basic policy premiums paid.

In the event this supplement is attached to a Brokerage Agreement, the word "Agent" used herein shall mean and refer to the Broker and shall not in any way change the capacity of the broker to that of an Agent.

The Principal shall have the right to amend the terms and compensation of this Supplement in accordance with provision "5" of the Agreement of Agency or Brokerage Agreement.

## Supplement to Agreement of Agency

SCHEDULE OF FIRST YEAR COMMISSIONS ON PENSION TRUST BUSINESS

### Per Cent of Premiums

**Whole Life Plans**
Whole Life 100, Whole Life 1000,
EstateGuard, ..................................... 50%
Resource Whole Life ........................ 20%
Retirement Annuity .......................... 3%

**Term Insurance**
YRT .................................. 40%
ACT .................................. 35%
NCT .................................. 10%

**Riders**
PUA Rider ............................... 3% } Years
PUI Rider (m) ........................ 3% } 1 - 10

| Premium Paying Period | Limited Payment Life INCL L-96 & L-97 | Premium Paying Period | Limited Payment Life INCL L-96 & L-97 |
|---|---|---|---|
| 40 Years and Over | 50 | 22 | 47 |
| 39 | 50 | 21 | 46 |
| 38 | 50 | 20 | 45 |
| 37 | 50 | 19 | 44 |
| 36 | 50 | 18 | 43 |
| 35 | 50 | 17 | 42 |
| 34 | 50 | 16 | 41 |
| 33 | 50 | 15 | 40 |
| 32 | 50 | 14 | 39 |
| 31 | 50 | 13 | 38 |
| 30 | 50 | 12 | 37 |
| 29 | 50 | 11 | 36 |
| 28 | 50 | 10 | 35 |
| 27 | 50 | 9 | 32 |
| 26 | 50 | 8 | 30 |
| 25 | 50 | 7 | 25 |
| 24 | 49 | 6 | 20 |
| 23 | 48 | 5 | 15 |

### LIMITATION FOR POLICIES ISSUED AT AGES OVER 70

For policies issued at ages over 70, the first year commission percentage stated above is subject to "120 less the issue age" except for Resource Life. For Resource Whole Life policies issued at ages over 70, the first year commission percentage is subject to "90 less the issue age." For EstateGuard policies, the issue ages for purposes of this paragraph shall be the ages of the younger insureds. No first year commissions in excess of the maximums shall be paid.

RENEWAL COMMISSIONS

| | | | | | | YEARS | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| Whole Life 100, Whole Life 1000, EstateGuard, L-96, L-97 and Limited Payment Plans, .................... 10% | 10% | 10% | 3% | 3% | 3% | 3% | 3% | 3% | |
| ACT, Resource Life................ 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | |
| NCT .................................. 5% | 5% | 5% | 5% | 2% | 2% | 2% | 2% | 2% | |
| Retirement Annuity ............. 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | |
| YRT .................................. 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | |

A337 Rev. (10/02)

## COMMISSION PAYMENT RULES
### (Life, Health and Pension Trust Business)

(1) Commissions on premiums paid for benefits supplemental to policies of Insurance shall be paid at the same rate as is then payable on the premium then due on the policy to which the supplemental benefits are attached, excluding paid-up Addition Rider and Paid-up Insurance. Such commission shall be paid to the agent who secured the application for the policy without regard to whether or not he/she is the agent who secured the application for the supplemental benefits. No commissions will be paid on the Renewable Business Guardian Rider in the renewal period.

(2) For plans, issue ages, and premium paying periods other than those mentioned in the schedules, the commissions will be quoted upon request to the Principal.

(3) No commissions shall be paid on temporary extra premiums, for interim term life insurance, on premiums waived on death under a combined Waiver of Premium Benefits, nor any cash value or reserve adjustment paid to the Company on any change of policy form, nor upon the payment necessary to make a policy paid-up, either by application of dividends or otherwise, nor on premiums paid for one year term additions or paid up additions. For Pension Trust series policies, no commission will be paid on any "cost of exchange" paid upon exchange of a life policy under its provision entitled "Privilege of exchange for paid-up retirement annuity contract" or upon exchange of a retirement annuity contract under its provision entitled "Privilege of exchange on or before retirement date." For a Health insurance policy issued with a Preliminary Insurance Rider, policy years for the purpose of determining the commission rate will be measured from the beginning of the preliminary insurance period.

(4) Commissions shall be paid on life and health premiums waived on account of disability or on premiums waived on account of disability under a Combined Waiver of Premium Benefits.

(5) Commissions will be paid if and as they accrue on premiums paid by policy loans or by application of dividends, or by check when such check has been honored.

(6) On any premium paid in advance, the commission will not be due until the contractual due date of such premiums.

(7) Commissions paid on premiums refunded by the Company because of recission or reformation of a contract shall be repaid to the Principal regardless of any resulting litigation or compromise settlement.

(8) Commissions payable on conversion or renewal of Term Insurance, income Annuities, and Deferred Life Income Contracts, and designation of the Agent entitled thereto, commissions payable on an increase in health premiums on account of a change in the coverage and commissions payable on reinstatement of a policy and the designation of the Agent entitled to any such commissions shall be in accordance with the Company's rules in effect when the conversion, renewal, change or reinstatement is made.

(9) There shall be an equal division of production credit and agent's commissions between the Agent and the Principal or the Agent and other agents of the Company, on business secured through the joint efforts of such persons unless otherwise agreed by such agents and so indicated on the application for such business.

(10) The Agent Shall not be entitled to commissions unless his name appears on the application as the soliciting Agent. No commissions shall be paid beyond the premium paying period.

(11) Commissions on a new policy which is a replacement of previously issued insurance in this Company will be paid only in accordance with the Company rules in effect when the replacement is issued.

In the event this supplement is attached to a Brokerage Agreement, the word "Agent" used herein shall mean and refer to the Broker and shall not in any way change the capacity of the broker to that of an Agent.

The Principal shall have the right to amend the terms and compensation of this Supplement in accordance with provision "5" of the Agreement of Agency or Brokerage Agreement.

(12) In those instances where "Benchmark Gross Level Premiums" on life insurance policies (as defined in Section 4228 of the New York Insurance Law) should be less than actual first policy year basic policy premiums paid, the first year commissions shall be determined by applying first year commission rates to "Benchmark Gross Level Premiums" instead of the actual first policy year basic policy premiums paid.

## SUPPLEMENT TO AGREEMENT OF AGENCY COMPENSATION ON DISABILITY BUSINESS

**APPENDIX D**

1.   SCHEDULE OF BASIC COMMISSIONS - Per Cent of Annual Premiums Per Policy Year

| | 1 | 2 | | 3-10 Inclusive | 11 and Subsequent * |
|---|---|---|---|---|---|

Policies eligible for Variable Renewal Commissions Based on Persistency & Volume (see item 2)

Year - to - date 1st year
Premium (all classes) * *

| | Up to $12,000 | Up to $25,000 | $25,000 and up | | | |
|---|---|---|---|---|---|---|
| NC109, 111, 112, OE102, 0100, 1100, 4100 & 5100 | | | | | | |
| Occupation Classes | | | | | | |
| 6, 5, 4 & 3 | 50% | 55% | 60% | 5% | 5% | 2% |
| 2 | 35% | 40% | 45% | 5% | 5% | 2% |
| 1 | 25% | 30% | 35% | 5% | 5% | 2% |
| | | | | | | |
| NC114, 2100 | | | | | | |
| Occupation Classes | | | | | | |
| 6, 5, 4 & 3 | 40% | 45% | 50% | 2% | 2% | 2% |
| 2 | 25% | 30% | 35% | 2% | 2% | 2% |
| 1 | 15% | 20% | 25% | 2% | 2% | 2% |

Policies eligible for Variable Renewal Commissions Based on Persistency (see item 3)
NC82, AH84, NC98, NC99, OE105, BY106 & 3100

| | | | | | | |
|---|---|---|---|---|---|---|
| Occupation Classes | | | | | | |
| 6, 5, 4 & 3 | | 55% | | 15% | 5% | 5% |
| 2 | | 40% | | 10% | 5% | 5% |
| 1 | | 30% | | 10% | 5% | 5% |

Policies eligible for Health Persistency Payments (see item 4)

| | | | | | | |
|---|---|---|---|---|---|---|
| AH55 and NC56 | | 50% | | 10% | 10% | 10% |
| NC97 | | 30% | | 5% | 5% | 5% |
| 6100-No Persistency | | 50% | | 10% | 10% | 10% |

* Commissions will be payable to the agent as they accrue only if and as the agent is living.

* * These bands apply only to policies eligible for VRPV. They will be prorated in the first calendar year in which any premium is paid under this Agreement or any previous soliciting agreement on eligible forms based on the number of months remaining in the year starting with the month in which the first premium is paid.

2.   VARIABLE RENEWAL COMMISSIONS BASED ON PERSISTENCY AND VOLUME. An additional renewal commission shall be payable based on persistency of premiums under policy forms NC101, NC104, NC107 NC108, NC109, NC110, NC111, NC112, NC114, NC0100, NC1100, NC2100, OE102, OE4100 & OE5100 written under this Agreement, or any previous soliciting Agreement. Additional policy forms on which variable renewal commissions shall be payable shall be announced by the Company periodically.

At the end of each calender year the aggregate lapse rate of policies during the calendar year will be determined. The aggregate lapse rate will be determined by comparing the actual lapses by policy year to the standard lapses for each policy for premiums due and paid in the calendar year. The actual lapse rate will be expressed as a multiple of the standard lapse rate. Based on the agent's multiple a variable renewal rate will be developed in accordance with the schedule below.

| AGENT LAPSE RATE AS A MULTIPLE OF THE STANDARD LAPSE RATE | VARIABLE RENEWAL PERSISTENCY COMMISSION RATE AS A % OF PREMIUM IN EXCESS OF DEDUCTIBLE | AGENT LAPSE RATE AS A MULTIPLE OF THE STANDARD LAPSE RATE | VARIABLE RENEWAL PERSISTENCY COMMISSION RATE AS A % OF PREMIUM IN EXCESS OF DEDUCTIBLE |
|---|---|---|---|
| 0.50 or less | 12.5% | 1.40 | 6.5% |
| 0.65 | 11.5% | 1.55 | 5.5% |
| 0.80 | 10.5% | 1.70 | 4.5% |
| 0.95 | 9.5% | 1.85 | 3.5% |
| 1.10 | 8.6% | 2.00 or more | 2.5% |
| 1.25 | 7.5% | | |

Intervening rates will be determined by interpolation for multiples not shown.
The standard lapse rate shall be published annually by the Company.

The variable renewal rate will apply to all renewal premiums in excess of the deductible due and paid during the next calendar year on forms eligible for this type of commission. Until the end of the calendar year following the first year in which any premium is paid on forms eligible for this type of commission, the deductible will be $2,500; in the following calendar year, the deductible will be $7,500; thereafter, the deductible will be $12,000.

The Variable Renewal Commission will be payable to the agent as they accrue only if and as long as the agent is living.

A658 Rev. (7/01)



# GUARDIAN

Supplement to Agreement

of Agency or Brokerage Agreement

Schedules of Group Level Scale Commissions

# Effective January 1, 2002

# Supplement to Agreement of Agency or Brokerage Agreement
## Schedules of Group Level Scale Commissions

ORIGINAL NEW BUSINESS                    EFFECTIVE JANUARY 1, 2002

Per Cent of Premiums

A. All size groups

Commissions Payable are the Sum of Schedules A, B, C, D, E, & F

| | | (A) Group Life AD&D | (B) Group Dental | (C) Group Vision | (D) Group Short Term Disability | (E) Group Long Term Disability | (F) Group Medical |
|---|---|---|---|---|---|---|---|
| On the first | $      5,000 | 15.0 % | 10.0 % | 10.0 % | 10.0 % | 15.0 % | 5.0 % |
| On the next | 5,000 | 12.0 | 10.0 | 10.0 | 10.0 | 15.0 | 5.0 |
| On the next | 5,000 | 10.0 | 7.5 | 7.5 | 7.5 | 15.0 | 5.0 |
| On the next | 5,000 | 10.0 | 7.5 | 7.5 | 7.5 | 12.5 | 5.0 |
| On the next | 5,000 | 7.0 | 5.0 | 5.0 | 5.0 | 10.0 | 5.0 |
| On the next | 5,000 | 7.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| On the next | 20,000 | 5.0 | 2.5 | 2.5 | 2.5 | 5.0 | 5.0 |
| On the next | 200,000 | 3.5 | 1.5 | 1.5 | 1.5 | 0.5 | 3.5 |
| On the next | 250,000 | 2.0 | 1.5 | 1.5 | 1.5 | 0.5 | 2.0 |
| On the next | 2,000,000 | 1.0 | 1.0 | 1.0 | 1.0 | 0.5 | 1.0 |
| Excess over | 2,500,000 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |

The total Group Life and Group AD&D premium will be used to determine commission

B. Optional Products

Commissions Payable are the Sum of Schedules A, B, C, D & E

| | | (A) Group Life AD&D | (B) Group Dental | (C) Group Vision | (D) Group Short Term Disability | (E) Group Long Term Disability |
|---|---|---|---|---|---|---|
| On the first | $      5,000 | 13.0 % | 10.0 % | 10.0 % | 13.0 % | 13.0 % |
| On the next | 5,000 | 13.0 | 10.0 | 10.0 | 13.0 | 13.0 |
| On the next | 5,000 | 13.0 | 7.5 | 7.5 | 13.0 | 13.0 |
| On the next | 5,000 | 13.0 | 7.5 | 7.5 | 13.0 | 13.0 |
| On the next | 5,000 | 13.0 | 5.0 | 5.0 | 13.0 | 13.0 |
| On the next | 5,000 | 13.0 | 5.0 | 5.0 | 13.0 | 13.0 |
| On the next | 20,000 | 13.0 | 2.5 | 2.5 | 13.0 | 13.0 |
| On the next | 200,000 | 13.0 | 1.5 | 1.5 | 13.0 | 13.0 |
| On the next | 250,000 | 13.0 | 1.5 | 1.5 | 13.0 | 13.0 |
| On the next | 2,000,000 | 13.0 | 1.0 | 1.0 | 13.0 | 13.0 |
| Excess over | 2,500,000 | 13.0 | 0.5 | 0.5 | 13.0 | 13.0 |

## C. Group Universal Life

Commissions are payable at the certificate level.

|  | Premiums less than or equal to the target premium * | Premiums greater than the target premium * |
|---|---|---|
| First certificate year | 15.0 % | 2 % |
| Second through tenth certificate year | 6.0 | 2 % |
| Eleventh or greater certificate year | 2.0 | 2 % |

\* As specified in each insured's certificate

## D. Healthcare Solutions HMO & POS

|  | New York Commission Scales | New Jersey Commission Scales | Connecticut Commission Scales |
|---|---|---|---|
| On the first        $     5,000 | 4 % | 5 % | 5 % |
| On the next          5,000 | 4 | 5 | 5 |
| On the next          5,000 | 4 | 5 | 5 |
| On the next          5,000 | 4 | 5 | 5 |
| On the next          5,000 | 4 | 5 | 5 |
| On the next          5,000 | 4 | 5 | 5 |
| On the next         20,000 | 4 | 5 | 5 |
| On the next        200,000 | 4 | 5 | 5 |
| Excess over        250,000 | 4 | 5 | 4 |

## New York State

### DBL  -  other than Welfare Funds and Unions

|  | All Policy Years |
|---|---|
| On the first        $     5,000 | 20.0 % |
| On the next          5,000 | 10.0 |
| On the next         40,000 | 7.0 |
| On the next        200,000 | 4.0 |
| On the next        250,000 | 3.0 |
| On the next      1,500,000 | 2.0 |
| On the next      2,000,000 | 1.0 |
| Excess over      4,000,000 | 0.5 |

## ADDITIONAL NEW BUSINESS

In the event that at least six months after the effective date of any policy or plan the Group coverage is increased, producing additional premiums in excess of (a) $750 for Group Life Insurance, or (b) $2,500 of total annual premium, the commissions payable on account of such increased coverage shall be determined by the company in accordance with its Rules and Regulations applicable at the time such commission is payable. If any additional coverage is effective under such policy or plan within six months of the effective date of previously effective coverage the premiums for the previously effective coverage and for such additional coverage will be combined in applying the Schedule of Commissions above. In no event will commissions be paid on additional business, unless the annual premium produced by this additional business equals or exceeds $750.

## GROUP COMMISSION PAYMENT RULES

Each employer plan of insurance written under a group policy issued to an industry-wide multiple employer trust fund under an arrangement where the employees are individually solicited for participation in the plan by the Agent shall each be treated as a separate policy for all purposes of commission and wherever the term "policy" is used in this agreement it shall be deemed to mean the insurance plan of each employer.

Commissions on premiums refunded by the Company shall be refunded by the Agent.

No commissions are payable on premiums waived on account of disability. On premiums paid by check the commission is payable when such check has been honored. No commissions shall be paid on policies issued as a result of the conversion of group insurance of any kind including any coverage continued under a portability provision.

In the event a policy or plan is issued in replacement of an existing policy or plan or if a policy or plan is issued to provide coverage for a group of persons substantially all of whom were previously insured under an existing policy or plan such new policy or plan shall be deemed to have been issued as of the original effective date of the policy(s) or plan(s) it replaced for the purposes of determining the rates of commissions payable and the period for which commissions shall be vested. The term "existing policy or plan" will be deemed to include any policy or plan which has cancelled with The Guardian within 6 months of the effective date of the new policy or plan.

In the event the Agent submits an application for additional business to an existing policy or plan for which the Agent was not the original writing agent on the effective date of such policy or plan the commission payment rules shall apply as if the Agent were the original writing agent indicated in the original preliminary application for such policy or plan.

If a plan or policy is amended because state or federal law mandates that an insurer provide specified benefits for its policyholders or requires that an employer provide additional benefits to his employees, the amendment is not considered a new sale unless the Agent expends a significant effort in the course of adding the benefits.

The Rules and Regulations of the Company in effect on the date a commission payment is due shall apply in any case not covered by the terms of this supplement.

Scales shown do not apply in certain states in respect to statutory small employee plans or to certain community rated plans.

In the event this supplement is attached to a Brokerage Agreement form, the word "Agent" used herein shall mean and refer to the broker and shall not in any way change the capacity of the broker to that of an agent.

99-1290
A-535 (7/02)

The Guardian Life Insurance Company of America, New York, NY

## APPENDIX F

## OVERRIDING COMMISSION SCHEDULES

(A)    Life Insurance and Annuities

Percent of Premium

| Policy Years | Products With 15+ Years Premium Payments* | Products With 10 To 14 Years Premium Payments | Products With <10 Years Premium Payments | PUA/PUI Riders And Pension Trust Retirement Annuities |
|---|---|---|---|---|
| 1 | 5.0% | 5.0% | 3.0% | 0.5% |
| 2 & 3 | 5.0% | 5.0% | 5.0% | 0.5% |
| 4 & 5 | 5.0% | 2.0% | 2.0% | 0.5% |
| 6 thru 10 | 2.0% | 2.0% | 2.0% | 0.5% |

*Except on applicable business and during the first three contract years of Field Representatives eligible for training allowance where percentages of premium shall be 5.0% policy year 1, 9.0% policy year 2, 6.0% policy year 3, 3.0% policy year 4 and 1.0% policy years 5 through 10.

Products not covered by the scales in the above table include Yearly Renewable Term (YRT), Non-Convertible Term (NCT), LifeSpan (initial period), Guaranteed Issue Whole Life (GIWL), Supplemental Whole Life (SUPP), Resource Life (RLP) and BLICoA life insurance products. The overriding commission scales for these products as percents of premium are as follows:

| Policy Years | LifeSpan & YRT* | GIWL, SUPP & RLP | BLICoA Level Term** | NCT |
|---|---|---|---|---|
| 1 | 5.0% | 2.0% | 5.0% | 5.0% |
| 2 & 3 | 1.0% | 2.0% | 5.0% | 2.0% |
| 4 thru 10 | 1.0% | 2.0% | 1.0% | 2.0% |

*Initial period only on LifeSpan
**Overrides continue beyond 10 years on BLICoA Level Term products

| Policy Years | BLICoA UL Target Premiums | BLICoA UL Excess Premiums |
|---|---|---|
| 1 | 5.0% | 0.5% |
| 2 | 4.0% | 0.5% |
| 3 thru 10 | 3.0% | 0.5% |

Appendix F – Page 1

d wpdocs/GAContracts/GA Contract (1/2003)

(B)   Disability Income Insurance

    (1)   Basic Overriding Commissions

        A percentage of cash Disability Income premium in accordance with the following schedule:

| Policy Year | Forms NC101, NC104, NC107, NC108, NC109, NC110, NC111, NC112, NC114 & OE102 | Forms NC82, AH84 NC98, NC99, OE105 & BY106 | Forms AH55 and NC56 | Form NC97 |
|---|---|---|---|---|
| 1 | 5.0% | 10.0% | 10.0% | 5.0% |
| 2 – 5 | 2.0% | 3.0% | 5.0% | 2.5% |
| 6 – 10 | 0.0% | 3.0% | 5.0% | 2.5% |
| 11+ | 0.0% | 3.0% | 5.0% | 2.5% |

    (2)   Additional first-year overriding commissions based on size of agency.  An additional first-year overriding commission shall be payable (in addition to the first-year overriding commission outlined in (B) (1) above in any calendar year in which the first-year cash Disability Income commissions of the agency exceed the levels below:

| First-Year Disability Income Commissions | Additional First-Year Overriding Commission as a Percentage of First Year Cash Disability Income Commissions |
|---|---|
| $0    to    $31,000 | 0% |
| $31,001 to   $46,500 | 20% |
| $46,501 to   $62,000 | 25% |
| $62,001 to   $77,500 | 30% |
| $77,501 to   $93,000 | 40% |
| $93,001 to  $124,000 | 50% |
| $124,001 to $155,000 | 60% |
| Over $155,000 | 70% |

The above schedule may be increased annually by the greater of (a) the Company's percentage increase in new Disability paid premiums for the prior year or (b) the Company's average percentage increase in new Disability paid premiums for the prior three years.  Any such increases will be announced by the Company each January and will become operative immediately for the current calendar year.

The first-year Disability commission levels shall be prorated only in the first calendar year of this Agreement.

Appendix F – Page 2

(3)    Variable Renewal Overriding Commissions Based on Persistency

An additional renewal overriding commission shall be payable based on persistency of premiums under policy forms NC75, NC76, NC77, NC85, NC86, NC87, NC93, NC94, NC95, NC96, NC98, NC99, NC82, OE105, AH84 written under this Agreement. Additional policy forms on which persistency Incentive renewal overrides shall be payable may be periodically announced by the Company.

At the end of each calendar year, the aggregate agency lapse rate of all eligible policies during the calendar year will be determined.  This lapse rate will be determined by comparing the actual lapses by policy year to the standard lapses for each policy year for premiums due and paid in the calendar year.  The actual agency lapse rate will be expressed as a multiple of the standard lapse rate.  Based on this multiple, the variable renewal overriding rate will be developed in accordance with the schedule below.  The variable renewal overriding rate will apply to all second year or later premiums due and paid the next calendar year on forms eligible for this type of commission.

| Agency Lapse Rate as a Percentage of the Standard Lapse | Disability Incentive Persistency Overriding Rate as a Percentage Of Premium |
|---|---|
| 1.0 or less | 5.0% |
| 1.1 | 4.5% |
| 1.2 | 4.0% |
| 1.3 | 3.5% |
| 1.4 | 3.0% |
| 1.5 | 2.5% |
| 1.6 | 2.0% |
| 1.7 | 1.5% |
| 1.8 | 1.0% |
| 1.9 | 0.5% |
| 2.0 or more | 0.0% |

Intervening rates will be determined by interpolation for multiples not shown.

The standard lapse rate shall be published annually by the Company.

(4)    Variable Renewal Overriding Commissions Based on Persistency and Volume

An additional renewal overriding commission shall be payable based on persistency of premiums under policy form NC101, NC104, NC107, NC108, NC109, NC110, NC111, NC112, NC114 & OE102, written under this Agreement.  Additional policy forms on which this persistency incentive renewal override shall be payable may be periodically announced by the Company.

Appendix F – Page 3

At the end of each calendar year, the aggregate agency lapse rate of all eligible policies during the calendar year shall be determined.  This lapse rate will be determined by comparing the actual lapses by policy year to the standard lapses for each policy for premiums due and paid in the calendar year. The actual agency lapse rate will be expressed as a multiple of the standard lapse rate.  Based on this multiple, the variable renewal overriding rate will be developed in accordance with the schedule below.

| Agency Lapse Rate as a Multiple of The Standard | Disability Incentive Persistency Overriding Rate as Percentage of Premium in excess of Deductible |
|---|---|
| 0.50 or less | 6.0% |
| 0.65 | 5.6% |
| 0.80 | 5.2% |
| 0.95 | 4.8% |
| 1.10 | 4.4% |
| 1.25 | 4.0% |
| 1.40 | 3.6% |
| 1.55 | 3.2% |
| 1.70 | 2.8% |
| 1.85 | 2.4% |
| 2.00 or more | 2.0% |

Intervening rates will be determined by interpolation for multiples not shown.

The standard lapse rate shall be published annually by the Company.

The variable renewal overriding rate will apply to all renewal premiums in excess of the deductible due and paid during the next calendar year on forms eligible for this type of commission.  Until the end of the calendar year following the first year in which any premium is paid on forms eligible for this type of override, the deductible will be $20,000; in the following calendar year, the deductible will be $60,000; thereafter, the deductible will be $100,000.

C)    Group Insurance and Group Annuities

(1)    Full-time Agents and Field Representatives:  15% of the first-year and 10% of the renewal commissions due and payable to the producer, exclusive of service fees, if any, on all Group Insurance and Group Annuities, except on Group LTD/DBL where the rate shall be 10% of the commissions.

(2)    Brokers: 3.75% of the first-year commissions and 1% of the renewal commissions due and payable to the producer, exclusive of service fees, if any, on all Group Insurance and Group Annuities, except on Group LTD/DBL where the rate shall be 2.5% of the first-year commissions and 1% of the renewal commissions.

Appendix F – Page 4

The producer commissions referred to above, upon which Group Overrides will be calculated, shall be determined as described below:

For Conventionally Funded business, the first year and renewal commissions in (1) and (2) above shall be defined as follows:

a.  On standard commission cases, the actual commissions paid.

b.  On cases/coverages with negotiated level commissions, the level commissions paid. Additionally, for those coverages not subject to a negotiated level commission, the actual commissions paid will be added into the total.

c.  On case/coverages where no commissions are paid, the standard commission which would be applied to the insured business. Additionally, for those coverages not subject to a negotiated level commission, the actual commissions paid will be added into the total.

For Alternately Funded business, the first year and renewal commissions in (1) and (2) above shall be defined as follows:

a.  On alternately funded cases/coverages, excluding Dental and Loss of Time ASO business and Dental Maintenance Organization (DMO) business, the standard commission scale applied to "Equivalent premium", i.e., the premium which would be applicable if the coverage was conventionally funded.

b.  On Dental and loss of Time ASO business and DMO business, the commissions paid from the applicable commission scales.

c.  On cases/coverages with negotiated level commissions, the level commissions paid. Additionally, for those coverages not subject to a negotiated level commission, the actual commissions paid will be added into the total.

d.  On cases/coverages where no commissions are paid, the standard commission scale applied to "equivalent premium". Additionally, for those coverages not subject to a negotiated level commission, the actual commissions paid will be added into the total.

Appendix F – Page 5

J:\wpdocs/GAContracts/GA Contract (1/2003)

## APPENDIX G

EXPENSE ALLOWANCE PAYMENTS

For purposes of the calculations herein, a contract effective date of **_February 1, 1999_** shall be operative.

Expense allowance payments shall consist of the sum of (A) (1) through (4) less the sum of (A) (5) and (6) as follows:

(A)  Expense Allowance Payment Components

(1) Percentages of first year base life cash premiums on life insurance products, except for those specified in (F) below, determined at the end of previous calendar years as outlined in (B) below, as such percentages may be supplemented by percentages of first year base life cash premiums from one or more prior calendar years as outlined in (C) below, but not to exceed 94% of first year base life cash premiums less first year base life commissions of current calendar years on life insurance products excluding those specified in (F) below.

(2) MDRT Mentorship Management subsidies, if any, approved in writing by the Company.

(3) New Agency Development Allowance on base first year life commissions of current calendar years excluding first year commissions on life insurance products specified in (F) below.

(4) Percentages of first year life commissions on life insurance products specified in (F) below.

(5) Agency expenses paid for directly by the Company for the Principal including, but not limited to, the fringe benefits of clerical and supervisory employees of the Principal and Company provided furniture and equipment reduced by the portions of such expenses attributable to individual disability income and group insurance sales of the agency as measured by the ratio that the first year overriding commissions on such products bears to total first year life, disability income and group insurance commissions.

(6) Reductions resulting from Section 4228 calculations as outlined in (E) below.

Appendix G – Page 1
d:\wpdocs/GAContracts/GA Contract (1/2003)

(B) Percentages of First Year Base Life Cash Premiums

   (1) Eighty five percent (85%) of first year base life cash premiums.

   (2) One to four percent (1% to 4%) of first year base life cash premiums in accordance with the agency first year commission levels that follow subject to potential reductions based on agency lapses.

   Level 4
   Four percent (4%) if total agency first year commissions are a minimum $4,700,000 with at least $3,290,000 first life and disability income commissions.

   Level 3
   Three percent (3%) if total agency first year commissions are a minimum $1,800,000 with at least $1,260,000 first life and disability income commissions.

   Level 2
   Two percent (2%) if total agency first year commissions are a minimum $1,200,000 with at least $840,000 first life and disability income commissions.

   Level 1
   One percent (1%) if total agency first year commissions are a minimum $600,000 with at least $420,000 first life and disability income commissions.

   Total agency first year commissions for this part include all life insurance, disability income insurance, group insurance, annuity and equity commissions credited for National Management Award purposes.  Total agency first year commissions and life and disability income commissions outlined for each Level above may be changed annually as announced by the Company.

   Lapses
   The percentages based on agency first year commission levels shall not be reduced where percentages of aggregate actual life premium lapses of the last three calendar years divided by aggregate expected life premium lapses of the last three calendar years have not exceeded 100%.  In those instances where percentages of aggregate actual life premium lapses of the last three calendar years divided by aggregate expected life premium lapses of the last three calendar years have exceeded 100%, the percentages based on agency first year commission levels shall be reduced by those percentages in excess of 100%.  For example, if Level 3 has been achieved but the aggregate actual life premium over aggregate expected life premium lapses is 110%, the 3% for Level 3 is reduced by the 10% excess over 100% to 2.7%.

Appendix G – Page 2
d:/wpdocs/GAContracts/GA Contract (1/2003)

Actual life premium lapses are annual life premiums on regular life and pension trust insurance policies that changed status from in force (including policies with premiums waived) to statuses of surrender, lapse, reduced paid-up or extended term (including policies where extended term periods have already expired when non-forfeiture options were exercised), and reductions in annual life premiums on regular life and pension trust policies of a voluntary, non-contractual nature on dates other than original policy dates (excluding reductions caused by improvements in policy ratings and changes from smoker to non-smoker status). Actual life premium lapses are reduced by reinstatements or revivals of policies to in force status that were previously changed to statuses of surrender, lapse, reduced paid-up or extended term, and increases in annual life premiums due to additions or increases in insurance coverage on dates other than original policy dates. Annual life premiums counted as actual agency lapses on policies that have gone on reduced paid-up are the amounts of premiums proportional to the decreases in the face amount of coverage before and after such policies became reduced paid-up policies. Annual life premiums on conversions, deaths, maturities and expires are excluded as actual agency lapses.

Expected agency lapses are determined by multiplying agency premiums by expected lapse factors shown below:

| Policy Years | Permanent Premiums | Pension Trust Premiums* | Term Insurance Premiums |
|---|---|---|---|
| 1 | 10.00% | 15.00% | 20.00% |
| 2 | 6.00% | 9.00% | 12.00% |
| 3 | 5.00% | 7.50% | 10.00% |
| 4 | 4.40% | 6.60% | 8.80% |
| 5+ | 4.00% | 6.00% | 8.00% |

*includes pension trust term insurance

(3) Percentages of first year base life cash premiums in accordance with the total number of field representatives appointed in the agency of the Principal as follows:

| # of FRs Appointed | %s Earned |
|---|---|
| Less than 6 | 0.00% |
| 6 | 0.50% |
| 7 to 12 | 0.50% + 0.167% per FR over 6 up to 12 |
| 13 to 18 | 1.50% + 0.20% per FR over 12 up to 18 |
| Over 18 | 2.70% + 0.30% per FR over 18 |

Appendix G – Page 3

(4) One and one-half percent (1.5%) of first year base life cash premiums if there's been an increase in the number of active field representatives of the agency at the end of immediately preceding calendar year over the number of active field representatives of the agency at the end of the calendar year before the immediately preceding calendar year  equal to 10% of the number of active field representatives of the agency at the end of the calendar year before the immediately preceding calendar year.  However, nothing shall be earned under this part if the increase in the number of field representatives shall have been less than 3.  The Principal may earn 1.5% under this part even if the percentage increase in the number of active field representatives shall have been less than 10% as long as the increase in the number of field representatives shall have been 7.

If the Principal has increased the number of active field representatives at a rate greater than 10% (or a percentage increase rate in keeping with the rules regarding the minimum and maximum numbers of increases in field representatives outlined above), the Principal shall earn a percentage greater than 1.5% under this part.  Such greater percentages of first year base life cash premiums shall be in proportion to the ratio that the actual increase percentage of the Principal bears to the 10% rate (or the rate determined in accordance with the rules regarding minimum and maximum numbers of increases in actual field representatives of the agency).  For example, if the Principal would have earned 1.5% for increasing the number of field representatives of the agency by 4 field representatives but instead achieved an increase of 8 field representatives or 20%, the percentage of first year base life cash premiums of the Principal under this part would be 3.00%.

In determining the increase in the active number of field representatives at the end of the immediately preceding calendar year required for the Principal to earn percentages of first year base life cash premiums under this part, fractions of field representatives will be rounded down to the nearest whole number of field representatives.  For example, if the Principal had 42 active field representatives at the end of the calendar year before the immediately preceding calendar year, an increase of 4 field representatives would be required to generate the 1.5% of first year base life cash premiums.

Appendix G – Page 4
d:\wpdocs/GAContracts/GA Contract (1/2003)

(5) Percentages of first year base life cash premiums in accordance with agency growth in life annual premium of the preceding year over the average of the life annual premium of the agency in the three calendar years prior to the immediately preceding calendar year (or average of the life annual premium of all full calendar years prior to the immediately preceding calendar year if less than three) as follows:

| %s of Growth in Life Annual Premium* | %s of First Year Base Life Cash Premiums |
|---|---|
| Less than 6.0% | 0.00% |
| 6.00 | 1.20% |
| 10.0% | 2.00% |
| 15.0% | 3.00% |
| 25.0% | 4.75% |
| 50.0% | 7.00% |
| 75.0% | 8.50% |
| 100.0% | 10.00% |

*Seventy five percent (75%) of the these rates will apply if the Company growth in life annual premium of the immediately preceding calendar year over that of the calendar year before the immediately preceding calendar year has been negative but less than 5% negative. Fifty percent (50%) of these rates will apply if the Company growth in life annual premium of the immediately preceding calendar year over that of the calendar year before the immediately preceding calendar year has been negative 5% or more.

In determining the growth in life annual premium under this part, all life premium produced by the agency except for premiums generated on Paid-Up Addition Riders, Paid-Up Insurance Riders and Pension Trust Retirement Annuities shall be counted.

Percentages of first year base life cash premiums on growth rates not shown on the left hand side of the chart above will be interpolated.

(6) One half of one percent (0.5%) of first year base life cash premium if at least sixty percent (60%) but less than seventy percent (70%) of all field representatives subject to the Company's full Annual Production Requirement (as announced annually by the Company) achieve such full Annual Production Requirement in the immediately preceding calendar year. A full one percent (1.0%) if seventy percent (70%) or more of those field representatives subject to it achieve the full Annual Production Requirement.

Appendix G – Page 5

(7) Percentages by which financing losses on field representatives charged to the Principal in accordance with the rules that follow exceed one percent (1.0%) of first year base life cash premiums on life insurance products excluding those specified in (F) below (but 2.0% for the calendar year 2002 only).

(a) CHARGES AT THE END OF ANY EMPLOYMENT YEAR IF SALARY EXCEEDS SCHEDULE EARNINGS

For each Field Representative whose salary for an employment year ending during a calendar year exceeded his schedule earnings, as defined in the Field Representative's Plan, the charge is determined in accordance with the following schedules:

(a) Field Representatives Eligible for Training Allowance

| END OF EMPLOYMENT YEAR OF A FIELD REPRESENTATIVE | PERCENTAGE OF EXCESS OF SALARY OVER SCHEDULE EARNINGS |
|---|---|
| 1 | 50% |
| 2 | 50% |
| 3+ | 50% |

(b) Field Representatives Not Eligible for Training Allowance

| END OF EMPLOYMENT YEAR OF A FIELD REPRESENTATIVE | PERCENTAGE OF EXCESS OF SALARY OVER SCHEDULE EARNINGS |
|---|---|
| 1 | 100% |
| 2 | 75% |
| 3+ | 50% |

(b) CHARGES IN THE EVENT OF TERMINATION

For each Field Representative whose employment is terminated and whose salary plus unearned advances of incentive compensation for the period of time from the effective date of appointment or last anniversary date to the date of termination exceeds schedule earnings, the charge is determined in accordance with the following schedules:

Appendix G – Page 6

i.    Field Representatives Eligible for Training Allowance

| EMPLOYMENT YEAR OF A FIELD REPRESENTATIVE DURING WHICH TERMINATION OCCURS | PERCENTAGE OF EXCESS OF SALARY AND UNEARNED ADVANCES OF INCENTIVE COMPENSATION OVER SCHEDULE EARNINGS |
|---|---|
| 1 | 50% |
| 2 | 50% |
| 3+ | 50% |

ii.    Field Representatives Not Eligible for Training Allowance

| EMPLOYMENT YEAR OF A FIELD REPRESENTATIVE DURING WHICH TERMINATION OCCURS | PERCENTAGE OF EXCESS OF SALARY AND UNEARNED ADVANCES OF INCENTIVE COMPENSATION OVER SCHEDULE EARNINGS |
|---|---|
| 1 | 100% |
| 2 | 75% |
| 3+ | 50% |

In calculating the financing losses under (B) (7), the financial position of field representatives as of the last dates they received salary payments will be utilized unless they terminated at the end of periods of voluntary suspension and were validating their salaries as defined in the Field Representatives' Plan.

(8)  The percentage of first year base life cash premium outlined in (B) (1) above shall be operative for all calendar years of this Agreement.  Those determined in (B) (2) through (B) (6) above shall first be determined in the third calendar year and be operative for the fourth calendar year dating from the effective date specified on page 1 of this Appendix G.  The percentage determined in (B) (7) shall first be determined in the first calendar year and be operative for the second calendar year dating from the effective date specified on page 1 of this Appendix G.

Appendix G – Page 7

(C) Expense Allowance Payment Bank Accounts

If a percentage of first year base life cash premiums determined in (B) of this Appendix G exceeds ninety four percent (94%) in any calendar year of this Agreement, the excess of such percentage over 94% shall be carried forward as a bank account to be added to a percentage developed under (B) in the next following calendar year as long as the percentage determined in (B) for such next following years, supplemented by the bank account percentage added to it, shall not exceed 94% in that next following calendar year. If a percentage determined in (B) for a calendar year is 96% or less, it may only be added to a percentage determined in (B) in the next following calendar year.  However, if a percentage determined in (B) for a calendar year is greater than 96%, it may be added to percentages determined in (B) in both the next following calendar year and the year after the next following calendar year to the extent that the original excess percentage was not utilized in the next following calendar year.  Notwithstanding these provisions, any excess existing as of the end of the 2002 calendar will not be permitted to be carried forward beyond the end of the 2003 calendar year.

(D) New Agency Development Allowance

Percentages of first year life and pension trust commissions credited to the Principal in accordance with the following schedule:

| Period From | Period To | %s of Commissions |
| --- | --- | --- |
| 1/1/03 | 12/31/03 | 10.42% |
| 1/1/04 | 12/31/04 | 6.33% |
| 1/1/05 | 12/31/05 | 5.08% |
| 1/1/06 | 12/31/06 | 4.08% |
| 1/1/07 | 12/31/07 | 3.08% |
| 1/1/08 | 12/31/08 | 1.16% |
| 1/1/09 | 01/31/09 | 1.0% |
| | | |
| | | |
| | | |
| | | |

Appendix G – Page 8

d:\wpdocs/GAContracts/GA Contract (1/2003)

(E) Expense Allowance Payment Reductions

If the sum of (A) (1), (2), (3) and variable compensation earned in accordance with Section 7 less (A) (5) of this Appendix G shall exceed for any calendar year the limits of Section 4228 of the New York Insurance Law as specified in Section 4 of this Agreement, the expense allowance payments of this Appendix G will be reduced accordingly so as to insure such payments do not exceed Section 4228 limits.

(F) Percentages of First Year Cash Commissions

| Products | %s of First Year Commissions |
|---|---|
| Guaranteed Issue Whole Life | 50% |
| Supplemental Whole Life | 25% |
| Resource Life | 70% |
| LifeSpan | 50% |
| Yearly Renewable Term | 50% |
| Level 5 & 10 Year Term | 75% |
| Level 20 Year Term | 60% |
| Level 30 Year Term | 55% |
| Universal Life | 72% |

Appendix G – Page 9

## APPENDIX H

### SPECIAL POST-TERMINATION COMPENSATION

The Company shall pay to the Principal or the Principal's estate or lawful representative the life insurance collection fees and disability income overriding commissions specified herein after termination of the Agreement of General Agency if the Principal shall have qualified for such payments in accordance with the rules immediately following.

#### A. Qualification Rules

1. The Principal (or a stockholder, member or partner of the Principal) shall have retired at or after age 55 with a minimum of 15 years total qualified pension plan service or retired at age 65 or later with a minimum of 10 years service as a general agent or shall have died or become totally and permanently disabled.

2. The office of the Principal shall have generated minimum commissions in at least four out of the five last full calendar years preceding retirement, death or total and permanent disability no less than those specified as Level 2 in Appendix G of this Agreement.  No stockholder, member or partner of the Principal who was at some previous time the Principal under a separate Agreement of General Agency and who merged his or her office with another stockholder, member or partner of the Principal shall be considered to have met this qualification rule unless he or she has been a stockholder, member or partner of the Principal under the current Agreement of General Agency for a period of not less than four full calendar years or unless he or she has generated the minimum commissions in four out the last five full calendar years under both the current Agreement of General Agency and his or her previous Agreement of General Agency.

3. The Principal (or a stockholder, member or partner of the Principal) shall have successor management acceptable to the Company in place in an official capacity with the agency for a period of no less than three years prior to retirement, or in case of death or total and permanent disability, shall have successor management acceptable to the Company in place in an official capacity (i.e. Associate General Agent, Career Development Supervisor, functional supervisors, etc.) with the agency for any period of time.  The successor management acceptable to the Company shall execute either an Agreement of General Agency or a Career Development Manager Agreement with the Company immediately following the retirement, death or total and permanent disability of the Principal.

4. Office expenses of the Principal shall not have exceeded for each of the last three full calendar years prior to retirement, death or total and permanent disability the sum of the Principal's (a) Expense Allowances, (b) Collection Fees, (c) First-Year Overriding Commissions, (d) Overriding Commissions on products sold through wholly-owned subsidiaries of the Company, (e) revenues of any type received as a result of insurance and annuity business placed with other insurance companies exclusive of personal commissions of the Principal and (f) all other revenues paid to the Principal from sources outside the Company if such revenues shall continue to be paid to successor management following the Principal's retirement.  Depreciation, interest expense

Appendix H – Page 1

J:\wpdocs\GAContracts\GA Contract (1/2003)

(except interest paid to the Company), and personal and corporate income taxes shall be excluded from the definition of office expenses of the Principal.  Verification of office expenses and revenues shall be made by Company access to all of the Principal's financial information residing on the Company's Acuity Accounting System or by access to information on whatever accounting system the Company should then be accepting.  The Principal shall provide any and all additional information and records that it might prove necessary for the Company to have in order to make a determination.

5.  The retiring or totally and permanently disabled Principal shall execute an Agreement not to work or consult for any competitor of the Company on a form made available to him or her by the Company.

## B. Collection Fee Payments

The Company shall pay the qualified Principal or his estate or lawful representative Collection Fees at 1% of renewal life insurance premiums on life insurance business written under this Agreement of General Agency and previous Agreements of General Agency or Career Development Manager contracts in which the qualified Principal was a stockholder, member or partner.  The Company shall not pay these Collection Fees at 1% of renewal life insurance premiums that would otherwise be payable to a qualified Principal on life insurance business written under this Agreement of General Agency or previous Agreements of General Agency or Career Development Manager contracts in which the qualified Principal was a stockholder, member or partner as long as some other Principal, who was a stockholder, member or partner of the qualified Principal, maintains his or her active status with the Company as a general agent or Career Development Manager with the same agency following the retirement, death or total and permanent disability of the qualified Principal.  Provided, however, upon the retirement, death or total and permanent disability of such other Principal(s), the Company shall commence payment of these Collection Fees to all of the Principals as follows:

In the event that there should be two or more stockholders, members or partners of a Principal who have achieved qualified Principal status and who are no longer active as Principals with the Company, Collection Fee payments on the shared override code or codes of such stockholders, members or partners shall be apportioned in accordance with the ownership interests of general agent overriding commissions on file with the Company.

In no event shall Collection Fee payments be made on any life insurance products excluded by definition in accordance with the last sentence of the first paragraph of Section 3 of the Agreement of General Agency.

Collection fee payments shall be made for a continuous period of 15 years measured from the date payments initially commenced if successor management shall have remained active as either General Agent or Career Development Manager for more than two years from the retirement date or if successor management died prior to completing more than two years.  If successor management has not remained active for more than two years following retirement of the qualified Principal other

Appendix H – Page 2
d:/wpdocs/GAContracts/GA Contract (1/2003)

than by reason of death, Collection Fee payments shall then be suspended until such time as the Company shall have appointed some other General Agent or Career Development Manager to the office of the qualified Principal after which payments shall resume for the balance of the 15 years.  In no event shall payments be suspended for more than one year.  In the event of the death of a qualified Principal after Collection Fee payments have commenced, the remaining balance of such payments shall be made to a qualified Principal's estate or lawful representative.

## C.  Variable Renewal Overrides Based on Persistency and Volume

The Company shall pay the qualified Principal or his estate or lawful representative, in addition to the Basic Overriding Commissions payable as outlined in Appendix F, Subsection (B)(1) and in lieu of 2% of cash disability income premiums for policy years six through ten as outlined in the last sentence of the last paragraph of Section 5, Subsection (B)(6), 50% of Variable Renewal Overrides Based on Persistency and Volume as outlined in Appendix F, Subsection (B)(4) attributable to disability income business produced under this Agreement of General Agency and previous Agreements of General Agency or Career Development Manager contracts in which the qualified Principal was a stockholder, member or partner.  The Company shall not commence payment of the 50% of Variable Renewal Overrides Based on Persistency and Volume as indicated above on business produced in concert with some other Principal(s) under an Agreement of General Agency or Career Development Manager contract as long as the other Principal(s) who was a stockholder, member or partner of the qualified Principal maintains his or her active status with the Company as a general agent or Career Development Manager with the same agency following the retirement, death or total and permanent disability of the qualified Principal.

Under the circumstances outlined in the preceding paragraph, the Company shall continue to pay 100% of the Variable Renewal Overrides Based on Persistency and Volume without the imposition of termination deductions as outlined in Section 5, Subsection (B)(6) until the other Principal(s) shall no longer be active with the Company as a general agent or Career Development Manager at which point the payments at 50% of Variable Renewal Overrides Based on Persistency and Volume shall commence.  When the payments of 50% of Variable Renewal Overrides Based on Persistency and Volume commence, they shall continue for a continuous period of 15 years.

In the event that there should be two or more stockholders, members or partners of a Principal who have achieved qualified Principal status and who are no longer active as Principals with the Company, the 50% of Variable Renewal Overrides Based on Persistency and Volume on the shared override code or codes of such stockholders, members or partners shall be apportioned in accordance with the ownership interests of general agent overriding commissions on file with the Company.

## D.  General

All amounts payable hereunder shall be subject to any liens the Company may have against the qualified Principal or the qualified Principal's agency that arise under this Agreement of General Agency or any prior contracts or agreements between the qualified Principal and the Company or its subsidiaries.

Appendix H – Page 3
d:\wpdocs\GAContracts\GA Contract (1/2003)

EXHIBIT "2"

# FIELD REPRESENTATIVE AGREEMENT

**Parties:**    **Field Representative—** JOSEPH MIGNOGNA

of the City of GLENDALE , State of CA

**Company—** The Guardian Life Insurance Company of America
7 Hanover Square, New York 10004

**Effective Date:** MARCH 1, 2001

**Territory:**    **The territory of the**    **Agency** GLENDALE CA, WX

to which the Field Representative is assigned, but not exclusively.

1.  **The Company hereby contracts with the Field Representative on a full-time basis to:**

    (a) Upon proper licensing, solicit applications for life, health and group insurance as well as other Company products;

    (b) Aid in the maintenance of insurance in force;

    (c) Render service to policyholders and beneficiaries;

2.  **The Field Representative shall comply with and be bound by all the provisions of the Field Representative Plan, and the rules and regulations of the Company** as now in force or as they may hereafter be amended or supplemented, copies of which are on file in the office to which Field Representative is assigned.

3.  **During the continuance of this Agreement, the Field Representative will be expected to make his or her principal business activity the solicitation of applications for business in the company.** The Field Representative shall be free to exercise his judgment as to the time and place of solicitation within territory of persons acceptable to the Company, and as to the general conduct of his business, but he shall comply with and be bound by rules of the Company now in force or as they hereafter may be amended or supplemented; such rules, however, are not to interfere with such freedom of action of the Field Representative. Nothing herein contained shall be construed to create the relation of employer and employee between the Field Representative and the Principal or the Company..

4.  **While this Agreement is effective and in force, the Company will pay to the Field Representative a salary which,** in conjunction with any incentive compensation earned by and payable to him according to the Field Representative Plan, shall constitute full compensation for his services and expenses, except such compensation as stated in Paragraph 5 of this Agreement. The salary will be at the rate of $ ⁄ ⁶⁵⁰ per month, payable in equal installments on the fifteenth and last days of each month from the effective date until the end of the first contract year. The effective date shall be the first or sixteenth of the month next following approval by Company of this appointment and approval, if given, shall be within three months of date Field Representative signs this agreement. The rate of salary thereafter shall be as provided in the Field Representative Plan as now in force or as hereafter amended or supplemented.

5.  **On individual annuity business the Field Representative shall be compensated by commission payments as stated in the Field Representative Plan.**

6.  **This Agreement** shall continue in force subject to all of its terms until terminated by the Field Representative's death or retirement, or otherwise as stated in Paragraph 14 of this Agreement.

7.  **The Field Representative shall not,** either personally or by correspondence, or in any other manner, solicit applications for insurance or annuities until all licensing requirements have been duly met.

8.  **The Field Representative shall have no power or authority other than as herein expressly granted and** no other or greater powers shall be implied from the grant or denial of powers specifically mentioned herein. He shall have no power or authority to make, alter or discharge any contract in the name of the Company or to bind the Company by any promise or statement or to make, accept or endorse notes or to incur any liability on behalf of the Company or to waive a forfeiture or to waive, alter or amend the performance of any terms or conditions of any policy or other contract to which the Company is a party or to extend the time for the payment of a premium or to receive any money due the Company other than the first premium or other first consideration under any application for a policy of insurance or annuity contract issued by the Company.

A-661-4 (Rev. 10/99)

He shall turn over immediately to the Company all funds belonging to the Company which come into his possession. He shall have no authority whatsoever to negotiate any financial instruments made payable to Guardian Life or any of its subsidiaries and is not authorized to request that any negotiable instruments be made payable to him personally or to any entity with which he may be affiliated. Cash is included in the definition of negotiable instruments.

9. The Field Representative shall use no advertising material, prospectus, proposal or representation either in general or in relation to a particular policy or policies, unless the same shall have been furnished by the Company or until the consent of the Company thereto shall have been secured.

10. The Field Representative agrees to pay to the Company all charges provided for in the Company's rules as now in force or as such hereafter be amended or supplemented including but not limited to additional or optional policies, medical and inspection fees, and supplies.

11. All books, policy cards and papers connected with the business of the Company are and shall be the property of the Company and shall be returned to it upon demand.

12. All agreements theretofore entered into by and between parties hereto, whether oral or in writing, are hereby released, abrogated, and declared to be null, void and of no effect, except:

   (a) agreements relating to liabilities, obligations and instruments of indebtedness of the Field Representative to the Company and liens created in connection therewith;

   (b) the right to commissions hereafter accruing and earned under any prior agreement between parties hereto, subject to the Company's offsets and counter-claims.

13. No assignment of this Agreement or any amount due or to become due hereunder shall be valid.

14. This Agreement shall terminate immediately under the following conditions (as more fully set forth in Section IV of the Field Representative Plan): if the Field Representative

   (a) fails to validate his contract, unless extended or suspended;

   (b) fails to attain the Annual Production Requirement (as published annually by the Company)

   (c) solicits or places business with any other company, participates in the affairs or operation of another insurance company, becomes licensed to sell securities except through the Company's subsidiaries, commits a fraudulent, immoral or dishonest act, fails to report paid business, violates any insurance law, or fails to comply with the Company's rules and regulations.

   Either party may voluntarily terminate this Agreement at any time by written notice addressed to the other, to become effective not earlier than two weeks from date of delivery. Such written notice may be delivered personally or by regular mail, and may be given by the Company or with the concurrence of the Company by the manager of the Agency to which the Field Representative is assigned. On termination, the Company's liability for remuneration of any kind shall cease except as set forth in the Field Representative Plan.

15. The failure of the Company to require strict compliance with the terms of this Agreement or of any of the rules or regulations of the Company shall not operate as a waiver of such terms or as a release of the Field Representative of his obligations hereunder.

16. In all disputes arising under this agreement between the Field Representative and the Company, the Laws of the State of New York shall apply.

17. The Field Representative covenants and agrees that after termination of the Contract, whether terminated by the Field Representative or by the Company, the Field Representative will not, directly or indirectly by or through any partner, agent, employer, or from on the Field Representative's behalf, advise, induce or attempt to induce any policyholder or annuitant of the Company or any subsidiary company of the Company to lapse, cancel or replace any insurance policy or annuity of the Company or of any subsidiary company. These prohibitions shall last for a period of one (1) year following the termination of this Contract and shall be effective throughout the sales territory formerly covered by the Field Representative while subject to this Contract. In the event the Field Representative breaches this provision, the Field Representative agrees that the Company may compel the Field Representative's compliance with this provision by injunction, or by any other remedy at law or equity, or by any other remedy under this contract.

Page 2 of 3

18. The terms and conditions of the Plan as expressed in "FIELD REPRESENTATIVES' PLAN, Rules and Regulations, Tables and Illustrations," have been fully explained to me and, they, as may be prospectively amended by the Company as to all Field Representatives from time to time, are hereby made a part of and are incorporated in this agreement.

I understand that they include:

1. Completion of all pre-contract requirements.

2. Completion of a standard Prospect File.

3. Payment of salary based on production and, except as provided in the Plan, there is no vesting of commissions.

**THIS AGREEMENT MAY NOT BE CHANGED EXCEPT IN WRITING SIGNED BY PARTY TO BE BOUND, EXCEPT AS PROVIDED IN 18 ABOVE.**

**SEPARABILITY PROVISION.** If any provision of this Agreement is held to be invalid, the remainder of the Agreement shall not be affected thereby.

**IN WITNESS WHEREOF,** this Agreement becomes effective only after having been signed by both the Field Representative and by an authorized officer of the Company

In presence of                                          BY:

_____        _____        _____
                                        Field Representative                    (Date)

In presence of

_____        _____        _____
                                        Authorized Company Officer               (Date)

A-661-4 (Rev. 10/99)                                    Page 3 of 3

**THE GUARDIAN INSURANCE & ANNUITY COMPANY, INC.**
**FIELD REPRESENTATIVE AGREEMENT**

Agreement made this ___1st_____ day of __march____by and between The Guardian
Insurance & Annuity Company, Inc. ("**GIAC**"), a Delaware corporation and a wholly-
owned subsidiary of The Guardian Life Insurance Company of America ("**Guardian
Life**"), having its principal office located at 7 Hanover Square, New York, New York,
10004 and _JOSEPH MIGNOGNA_____   ("**Field Representative**").

    1.    The undersigned is presently a Field Representative of Guardian
Life in accordance with a Field Representative Agreement bearing
an effective date of __MARCH 1, 2001_____("**Guardian Life FR
Agreement**").

    2.    GIAC hereby appoints the Field Representative for the limited purpose of
soliciting applications for GIAC's Variable Whole Life Insurance Policies
with Modified Scheduled Premiums marketed under the name Park
Avenue Life ("**PAL**") and GIAC's Flexible Premium Variable Universal Life
Policies marketed under the name Park Avenue VUL ("**VUL**"). There may
be one or more policies marketed under the PAL name. Where necessary
or appropriate, this Agreement will distinguish between them by
appending the year of introduction. Currently, there are two policies
marketed under this name -- "PAL '95 and PAL '97."

    3.    The Field Representative shall at all times be associated with
Park Avenue Securities LLC ("**PAS**"), a Broker-Dealer
registered with the Securities and Exchange Commission ("**SEC**")
and a member of the National Association of Securities Dealers,
Inc. ("**NASD**") as an NASD Registered Representative or NASD
Registered Principal and, if the particular jurisdiction requires, shall
be licensed or registered as a securities agent of PAS. The Field
Representative must at all times be validly licensed, registered or
appointed by GIAC as a variable contracts agent in accordance
with the requirements of the jurisdiction where solicitations for PAL
and VUL contracts occur. The Field Representative may solicit for
and sell PAL and VUL contracts in any jurisdiction where such
contracts are filed and approved for sale by the governmental
authorities having jurisdiction, provided the Field Representative is
validly licensed, registered or otherwise qualified as required for
the solicitation and sale of the PAL and VUL contracts in such
jurisdictions.

1

A-661-5

4.  To the extent applicable, the Field Representative shall comply
strictly with: (a) the laws, rules and regulations of all jurisdictions
(state and local) in which the Field Representative solicits
applications for and sells PAL and VUL contracts; (b) federal laws
and the rules, regulations of the SEC; (c) the rules of the NASD;
(d) the rules and procedures of PAS, and (e) the rules and
procedures of GIAC. The Field Representative understands
that failure to comply with such laws, rules, regulations and
procedures may result in disciplinary action against the Field
Representative by the SEC, a state or other local regulatory
agency that has jurisdiction, the NASD, PAS and GIAC. Before
any solicitations or sales of PAL and VUL are made, the Field
Representative shall become familiar with and abide by the laws,
rules, regulations and procedures of all of the above mentioned
agencies or parties as are currently in effect and as they may be
changed from time to time.

5.  The Field Representative shall have all applications for PAL and
VUL accurately completed or reviewed and signed by the applicant
and shall submit the applications to GIAC through PAS together
with all payments received from applicants without any reductions.
The Field Representative shall cause all checks or orders for PAL
and VUL to be made payable to GIAC. GIAC shall reject any
application that is submitted by or on behalf of a Field
Representative not appropriately licensed as required by
paragraph 3 of this Agreement.

6.  The Field Representative shall not make any statements
concerning PAL and VUL except those that are contained in the
current prospectuses for PAL and VUL and the prospectuses for their
underlying variable investment options and shall not solicit for
applications or make sales through the use of mailings,
advertisements or sales literature or any other method of contact
unless the material or a complete description of the method has
been filed with the NASD and received written Approval of PAS
from a Registered Principal whose office is located in a PAS
Office of Supervisory Jurisdiction as that term is defined by NASD
rules.

7.  In connection with the appointment of the undersigned as a GIAC Field
Representative for the purpose set forth in paragraph 2 above, the
entire Guardian Life FR Agreement referred to above and attached

2

hereto as the Exhibit, including all compensation adjustment and
service fee provisions, is incorporated herein by reference.
Guardian Life FR Agreement compensation provisions that do not
apply to PAL and VUL are as noted below. All references to
"Company" within the Guardian Life Agency Agreement shall apply
with full force and effect to GIAC. Additionally, the Registered
Representative's Agreement between the Field Representative and
PAS and the Agent's Agreement between the Field
Representative and GIAC are incorporated herein by reference
and attached hereto as Exhibits.

8.    Field Representative compensation on PAL is described in
      Appendix A of the Agreement.

9.    Field Representative compensation on VUL is described in Appendix B of
      this Agreement.

10.   Allocation of VUL premiums and the effect thereof on compensation is
      described in Appendix C of this Agreement.

11.   This Agreement may be terminated as outlined in Paragraph 14 of the
      Guardian Life FR Agreement. In addition, it shall be automatically
      terminated if the Guardian Life FR Agreement, PAS Registered
      Representative Agreement or GIAC Agent's Agreement is terminated.

IT SHALL BE EXPRESSLY UNDERSTOOD BY THE FIELD REPRESENTATIVE THAT
THIS AGREEMENT SHALL NOT BE EFFECTIVE UNLESS THE FIELD
REPRESENTATIVE IS VALIDLY LICENSED IN ACCORDANCE WITH THE
REQUIREMENTS OF THE JURISDICTIONS WHERE SOLICITATIONS FOR PAL AND
VUL POLICIES OCCUR.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be
executed as of the day and year first written above.

_____
WITNESS

_____
WITNESS

_____
AUTHORIZED COMPANY OFFICER

_____
FIELD REPRESENTATIVE

3

## APPENDIX A

A.  FR Compensation Schedule

| Policy Years | LPC Factor on Policy Premiums | Unscheduled Payments 1985 Version FRs | Unscheduled Payments 1956/1967 Version FRs |
|---|---|---|---|
| 1 | 36 | 3.5% | 3% |
| 2 through 10 | * | 3.5% | 3% |

*Renewal compensation for preceding employment years on PAL policy premiums shall be the same as set forth in the Field Representatives Plan manuals for existing Plan versions (except that the rates applicable under Part A shall be 50% of standard rates, and in the case of the PAL '95 product only, Part C shall be entirely replaced by Part D as outlined below for those Field Representatives belonging to the 1985 FR Plan version).  FR Plan compensation factors shall operate in accordance with the effective date of the Guardian Life FR Agreement.

The first policy year LPC factor of 36 on policy premiums shall be reduced where policies are issued at ages over 70 with actual rates payable determined by deducting from the figure 106 ages of applicable insureds as of policy issue dates.

No compensation shall be payable on PAL policy premiums skipped under the Premium Skip Option of PAL policies.  If unscheduled payments are received when policies should be on the Premium Skip Option, renewal compensation on such payments shall be calculated at 5% and applied up to amounts of premium that correspond to renewal PAL policy premiums that would otherwise have been paid if not for the Premium Skip Option being in effect with standard renewal rates on unscheduled payments applied to any premiums received above such PAL policy premium levels.

B.  First Policy Year Compensation Chargebacks on PAL '95 Policies

Basic first policy year compensation on policy premiums at $13.75 per thousand of life production credits shall be charged back to Field Representatives on PAL '95 policies that are surrendered or lapsed prior to the policies having been in force for at least eighteen months in accordance with the following:

4

## APPENDIX A (CONTINUED)

| Policy Months of PAL '95 Surrenders or Lapses | Chargeback Percentages 1956/1967 Version FRs | Chargeback Percentages 1985 Version FRs |
|---|---|---|
| 1-3 | 75% | 82% |
| 4-6 | 70% | 77% |
| 7-10 | 65% | 71% |
| 11-13 | 55% | 60% |
| 14 | 50% | 55% |
| 15 | 40% | 44% |
| 16 | 30% | 33% |
| 17 | 20% | 22% |
| 18 | 10% | 11% |

5

## APPENDIX B

A.  FR Compensation Schedule

| Policy Years | LPC Factor on Target Premiums | Excess Premiums |
|---|---|---|
| 1 | 33 | 3.5% |
| 2 through 10 | * | 3.5% |

*3.5% policy years two through ten and 2.0% policy years eleven and over credited as Commission Equivalent Compensation (PGF)

VUL compensation shall cease at termination except in the event of retirement in accordance with Section II, Subsection K, Paragraph 1 of the Field Representatives' Plan or possibly in the event of death in accordance with Section II, Subsection L, Paragraph 1 of the Field Representatives' Plan.

6

## APPENDIX C
## ALLOCATION OF PREMIUMS AND THEIR EFFECT ON COMPENSATION

A.  General

In a first policy year, premiums will first be applied to policy target premium.  These will be compensated at first year rates.  Any premiums received in the first year of a policy exceeding policy target premium will be considered excess premium to be compensated at excess rates.

In policy years 2 through 10, any premium received up to nine times policy target premium will be applied as policy target premium and receive compensation at target premium renewal rates.  Any premium exceeding nine times policy target premium in policy years two through ten will be considered excess premium to be compensated at excess rates.

In policy years 11 and greater, the compensation on premium received will be at service fee rates.

B.  Increases In Coverage

Coverage increases will be reflected in self-contained segments of policies that have their own policy effective dates, policy year durations and policy premiums.  Premiums for policies with increases in coverage will be applied to each coverage and associated target premiums in the order the coverages were issued (earliest first). When the sum of the premiums during a given policy year exceeds the sum of all applicable target premiums, any additional amount will be allocated prorata based on target premiums for each coverage.  The amount thus allocated will be processed as outlined in the above general description (i.e. it will be processed with reference to policy years of the coverages and amounts of applicable target premiums paid).

C.  Decreases In Coverage

A coverage decrease will be applied to a last previous coverage increase, if any, or to the initial coverage should no coverage increase have taken place.  Such decrease will serve to reduce target premium for the full period so that any regular compensation on subsequent premium received will be based on lower target premium (i.e. The total of renewal compensation payable will be based on nine

7

## APPENDIX C (CONTINUED)

times the lower target premium).  Any premium amount applied over such lower
target premium will be compensated at excess rates for policy years 2 through 10
and at service fee rates for policy years 11 and greater.

First year compensation will be paid on coverage increases only to the extent such
increases should exceed previous coverage decreases.





GUARDIAN

**THE GUARDIAN INSURANCE & ANNUITY COMPANY, INC**
**AGENT'S AGREEMENT**

Parties:

Agent – ___JOSEPH MIGNOGNA_____, who resides at
PRINT NAME

___12615 HESBY ST.___         ___VALLEY VILLAGE___
STREET ADDRESS                              CITY

___CA, 91607_____ (hereinafter called "Agent").
STATE

Company – The Guardian Insurance & Annuity Company, Inc
7 Hanover Square, New York, NY 10004
(hereinafter called "Company").

Effective Date     ___April 18, 2001___
DAY    MONTH    YEAR

1.  **Appointment.**  The Company hereby appoints the Agent to solicit and remit to the Company applications for the purchase of variable annuities, variable life insurance, fixed annuities, fixed benefit life insurance, retirement savings plans qualified under Section 401 of the Internal Revenue Code and such other products offered by the Company to the public from time to time (hereinafter referred to as the "Contracts") as specifically authorized by the Company and for which the Company is properly licensed under federal, state and local laws for the jurisdiction(s) in which the Agent will solicit business. This appointment shall not be effective unless and until the Agent is duly licensed or otherwise qualified to sell the Company's Contracts under applicable federal, state and local laws. The Agent agrees not to solicit or procure applications for Contracts in any jurisdiction in which the Agent is not so licensed or otherwise qualified or in which the Company is not authorized to offer or sell Contracts. The Agent shall personally witness and transmit to the Company through the agency or office to which he or she is attached all applications for the Contracts, collect initial payments, countersign (when necessary) and promptly deliver any Contracts forwarded to him or her by the Company through the agency or office for that purpose, and shall perform such other duties and services for Contractowners and Contract beneficiaries pertaining to the business of the Company as may be required.

2.  **Compensation.**  Subject to the provisions of this Agreement and to any other agreement in effect regarding the assignment of commissions, the Agent will be paid commissions on the 15th and the 30th days of each month on all payments which are actually received and accepted by the Company on Contracts issued by the Company in connection with applications submitted under this Agreement. The amount of commissions will be determined in accordance with the Schedule of Commissions in effect when such payments are actually received and accepted by the Company. This Schedule is subject to change by the Company at any time and without notice but no such change shall affect commissions payable with respect to any premiums received prior to the effective date of the change except as provided in the Schedule. Commissions will be paid to the Agent only so long as he or she remains an Agent of the Company, and is duly licensed and registered. The Company has the right to off-set any indebtedness to it against commissions otherwise due the Agent.

3.  **Rejected Applications.**  The Company reserves the right to reject any applications, orders or payments remitted by the Agent and to refund to customers any payments made by them. If the Agent has received commissions on such refunded payments, the Agent agrees to repay such commissions in full immediately. If the Agent does not do so, the Company is authorized to deduct such amounts from commissions due or which may become due to the Agent in the future.

1

**4. Prompt Remittance.**

The Agent agrees to remit immediately upon execution, all applications and orders solicited by him or her, together with the full amount of all payments received from customers, without deduction. Checks or money orders for payments shall be drawn to the order of the Company. The Agent further agrees to comply with all other rules and procedures for the handling of applications or orders which may be established by the Company from time to time.

**5. License.**

The Agent has become or has applied to become, qualified to sell the Contracts under applicable federal, state and local laws and agrees to keep such qualification in effect. The Agent further agrees to comply, if applicable, with rules of the National Association of Securities Dealers, Inc ("NASD"), the statutes administered by the Securities and Exchange Commission (the "SEC") and rules and regulations promulgated thereunder and all other applicable federal and state laws, rules and regulations applicable to the conduct of the Agent's business as contemplated by this Agreement. The Agent understands that failure to comply with such rules, regulations, acts or statutes may result in disciplinary action against him or her by the NASD, the SEC, the Company and by any governmental authorities having jurisdiction.

**6. Proper Use of Advertising and Sales Material.**

The Agent shall use no advertising or sales material, prospectus, proposal, or representation either in general or in relation to a particular Contract unless furnished or previously approved by the Company. The Agent shall not prepare or distribute any illustration, chart, graph circular, statement or document of any sort, misrepresenting the terms, benefits or advantages of any Contract issued by the Company. Furthermore, the Agent shall not make any misleading statement as to the benefits to be received on any Contract issued by the Company, or as to historical or future investment performance relating to such Contract, or as to the financial position of the Company. All manuals, guides, books, tapes, programs and other materials developed by the Company which may be delivered to the Agent from time to time, and the information contained therein, will remain the sole and exclusive property of the Company, and shall be used solely in the solicitation of applications for Contracts covered by this Agreement. These materials may not be reproduced in any way, or disseminated to anyone other than a bona fide customer, without the prior written approval of an authorized officer of the Company. None of the information furnished to the Agent shall be disclosed to the Company's competitors without the prior written consent of the Company. In regard to those Contracts that are subject to the jurisdiction of the SEC, the Agent further agrees that he or she will make no written or oral representations concerning such Contracts unless such representations are consistent with the information contained in the current prospectuses for such Contract and its underlying investment options or any authorized sales literature made available by the Company. In respect to such Contracts, the Agent also agrees to comply with the rules and regulations of the NASD.

**7. Independent Contractor Status.**

The relationship of the Agent to the Company is that of an independent contractor, and nothing contained herein shall be construed to create an employer and employee relationship between the parties. The Agents, therefore are responsible for developing his or her own sales prospects and may freely determine, subject to applicable legal, regulatory and Company requirements, when and where he or she shall solicit business contemplated by this Agreement. The Agent shall comply with and be bound by the rules of the Company now in force or as they hereafter may be amended or supplemented, such rules, however, are not to interfere with such freedom of action of the Agent. The Agent shall not be required to spend any particular portion of his or her working time acting as an Agent for the Company. The Agent shall be free to continue employment with any other person, firm or corporation.

**8. Rights of the Company.**

In addition to other rights set forth herein or implied or necessitated by the terms hereof, the Company specifically reserves the rights to (a) modify or amend any Contract, (b) discontinue or withdraw any Contract from the Agent's jurisdiction in any other jurisdiction in which the Company is authorized to do business or in any other part of the Agent's jurisdiction), (c) fix maximum and minimum limits on the amounts for which any Contract may be issued (d) modify or alter the conditions or terms under which any Contract may be sold or regulate its sale in any way (e) cease doing business in all or any part of the Agent's jurisdiction, (f) change commissions or other ... on premiums received in the future upon prior notice to the Agent, and (g) require ...

that the Agent be bonded in an amount which bears a reasonable relationship to the composition and volume of the Agent's business with the Company. The Company's rights as reserved in (a) through (e) may be exercised at any time and without prior notice to the Agent. Nothing contained herein shall prevent or restrict the Company from appointing other agents either within or outside Agent's jurisdiction to solicit applications for Contracts.

9.   Expenses.

The Company shall not be responsible for the Agent's expenses, including but not limited to bonding, transportation, postage, expressage, advertising, telephone, telex or facsimile charges, and other expenses incidental to the Agent's business.

10.  Return of
     Materials.

In the event of termination of this Agreement, all prospectuses, application forms, sales literature, or other materials or supplies furnished to the Agent by the Company shall be promptly returned to the Company.

11.  Authority
     of Agent.

The Agent shall have no power or authority other than as herein expressly granted, and no other or greater powers shall be implied from the grant or denial of powers specifically mentioned herein. The Agent shall have no power or authority to make, alter or discharge any Contract in the name of the Company, or to bind the Company by any promise or statement, or to make, accept or endorse notes, or to incur any liability on behalf of the Company, or to waive a forfeiture or waive, alter or amend the performance, provisions, terms or conditions of any Contract or to extend the time for the payment of monies due the Company, or to collect money for the Company except as to the collection of the initial payment on Contracts issued by the Company pursuant to this Agreement. The Agent is not authorized to offer Contracts which are subject to regulation by the SEC unless he or she is duly registered with the NASD. Nothing contained herein shall prevent or restrict the Agent from acting as agent for other insurance companies in any jurisdiction.

12.  Contract Not
     Assignable.

Except to the extent permitted under Paragraph 13, the rights and benefits accruing hereunder to the Agent are not assignable.

13.  Assignment of
     Commissions.

No assignment of commissions by the Agent shall be permitted except in such cases, if any, as shall be expressly authorized in advance in writing by the Company. Any purported assignment of commissions without the written consent of the Company shall be void.

14.  Indemnification.

The Agent shall indemnify and hold the Company harmless from any loss or expense which results from any act or omission committed by the Agent in the conduct of his or her activities under this Agreement.

15.  General
     Provisions.

(a) The Agent and the Company agree to fully cooperate with each other in any state or regulatory investigation. The Agent and the Company will promptly inform the other party of any regulatory investigation or proceeding being conducted with respect to their activities.

(b) The non-enforcement or waiver of any provision of this Agreement by a party shall not imply the subsequent waiver of such provision or any simultaneous or subsequent waiver of any other provision hereof.

(c) Any notice under this Agreement shall be given by telegraph, facsimile or by mail, postage paid, addressed as indicated above or to such other address as a party may later designate in writing.

(d) To the extent this Agreement may be in conflict with any applicable law or regulation, this Agreement shall be construed in a manner not inconsistent with such law or regulation. The invalidity or illegality of any provision of this Agreement shall not be deemed to affect the validity or legality of any other provision of this Agreement.

(e) This Agreement supersedes all previous agreements, oral or written, between the parties hereto, and no modification hereof shall be valid unless made in writing and signed by all parties. This Agreement shall be governed by the laws of the State of New York.

3



**16. Termination.**   This Agreement may be terminated by either party at any time upon written notice to the other. This Agreement may be terminated for cause if the Agent (a) has wrongfully withheld any funds, property or documents belonging to the Company, (b) has misrepresented any product or service offered by or through the Company, (c) has failed to comply with the terms of this Agreement or the Company's rules and regulations currently in force or later brought to the Agent's attention in any manner, or (d) if the license of the Agent is revoked, suspended, or refused renewal by any federal or state regulatory body or self-regulatory organization. Upon termination for cause, the Agent shall have no further rights or privileges under this Agreement, except as otherwise provided herein. The Agent shall not, at any time, either during or after termination of this Agreement, induce any Contract owner of the Company to relinquish, surrender or lapse any Contract issued by the Company without prior written approval of the Company.

Executed in duplicate at New York , New York on or as of the "Effective Date" shown above.

THE GUARDIAN INSURANCE & ANNUITY COMPANY, INC.

by _____
        SIGNATURE OF AUTHORIZED OFFICER

_____
        SIGNATURE OF AGENT

EXHIBIT "3"

# FIELD REPRESENTATIVE AGREEMENT *(illegible)*

*AGENT CON*... *(illegible stamp)* DEPT.

Parties:  Field Representative— Ali *(handwritten)*
of the City of  Glendale , State of California
Company—  The Guardian Life Insurance Company of America
7 Hanover Square, New York 10004

*2005 MAY -9  AM 5: 55 (stamp)*

Effective Date:  05.01.00

Territory:  The territory of the Golden State Agency
to which the Field Representative is assigned, but not exclusively.

1.   The Company hereby contracts with the Field Representative on a full-time basis to:
   (a)  Upon proper licensing and appointment, solicit applications for life, health and group insurance as well as other Company products,
   (b)  Aid in the maintenance of insurance in force,
   (c)  Render service to policyholders and beneficiaries

2.   The Field Representative shall comply with and be bound by all the provisions of the Field Representative Plan, and the rules and regulations of the Company as now in force or as they may hereafter be amended or supplemented, copies of which are on file in the office to which Field Representative is assigned.

3.   It is the Field Representative responsibility to be properly licensed and to maintain such license in all jurisdictions in which he or she does insurance business.

4.   During the continuance of this Agreement, the Field Representative will be expected to make his or her principal business activity the solicitation of applications for business in the company. The Field Representative shall be free to exercise his or her judgment as to the time and place of solicitation within territory of persons acceptable to the Company, and as to the general conduct of his or her business, but he or she shall comply with and be bound by rules of the Company now in force or as they hereafter may be amended or supplemented; such rules, however, are not to interfere with such freedom of action of the Field Representative. Nothing herein contained shall be construed to create the relation of employer and employee between the Field Representative and the Principal or the Company. The Field Representative shall comply with all applicable federal and state insurance laws.

5.   While this Agreement is effective and in force, the Company will pay to the Field Representative a salary which, in conjunction with any incentive compensation earned by and payable to him according to the Field Representative Plan, shall constitute full compensation for his services and expenses, except such compensation as stated in Paragraph 6 of this Agreement. The salary will be at the rate of $ 5,000 per month, payable in equal installments on the fifteenth and last days of each month from the effective date until the end of the first contract year. The effective date shall be the first or sixteenth of the month next following approval by Company of this appointment and approval, if given, shall be within three months of date Field Representative signs this agreement. The rate of salary thereafter shall be as provided in the Field Representative Plan as now in force or as hereafter amended or supplemented.

6.   On individual annuity business the Field Representative shall be compensated by commission payments as stated in the Field Representative Plan.

7.   This Agreement shall continue in force subject to all of its terms until terminated by the Field Representative's death or retirement, or otherwise as stated in Paragraph 20 of this Agreement.

8.   The Field Representative shall not, either personally or by correspondence, or in any other manner, solicit applications for insurance or annuities until all licensing requirements have been duly met.

9.   The Field Representative shall have no power or authority other than as herein expressly granted and no other or greater powers shall be implied from the grant or denial of powers specifically mentioned herein. He shall have no power or authority to make, alter or discharge any contract in the name of the Company or to find the Company by any promise or statement or to make, accept or endorse notes or to incur any liability on behalf of the Company or to waive a forfeiture or to waive, alter or amend the performance of any terms or conditions of any policy or other contract to which the Company is a party or to extend the time for the payment of a premium or to receive any money due the Company other than the first premium or other first consideration under any application for a policy of insurance or annuity contract issued by the Company.

A-661-4 (Rev 5/01)                    Page 1 of 3

He shall turn over immediately to the Company all funds belonging to the Company which come into his possession. He shall have no authority whatsoever to negotiate any financial instruments made payable to Guardian Life or any of its subsidiaries and is not authorized to request that any negotiable instruments be made payable to him or her personally or to any entity with which he may be affiliated. Cash is included in the definition of negotiable instruments.

10. The Field Representative shall use no advertising material, written or oral, prospectus, proposal, concept or representation either in general or in relation to a particular policy or policies, unless the same shall have been furnished by the Company or until the consent of the Company or the Market Conduct and Compliance Unit thereto shall have been secured.

11. The Field Representative agrees to pay to the Company all charges provided for in the Company's rules as now in force or as such hereafter be amended or supplemented including but not limited to additional or optional policies, medical and inspection fees, and supplies.

12. All books, policy cards, papers and customer lists connected with the business of the Company are and shall be the property of the Company and shall be returned to it upon demand.

13. All agreements theretofore entered into by and between parties hereto, whether oral or in writing, are hereby released, abrogated, and declared to be null, void and of no effect, except

   (a) agreements relating to liabilities, obligations and instruments of indebtedness of the Field Representative to the Company and liens created in connection therewith;

   (b) the right to commissions hereafter accruing and earned under any prior agreement between parties hereto, subject to the Company's offsets and counter-claims.

14. No assignment of this Agreement or any amount due or to become due hereunder shall be valid.

15. This Agreement shall terminate immediately under the following conditions (as more fully set forth in Section IV of the Field Representative Plan): if the Field Representative

   (a) fails to validate his contract, unless extended or suspended;

   (b) fails to attain the Annual Production Requirement (as published annually by the Company);

   (c) For cause such as but not limited to: solicits or places business with any other company, participates in the affairs or operation of another insurance company, becomes licensed to sell securities except through the Company's subsidiaries, commits or admits to a fraudulent, dishonest codefalcation act, fails to report paid business, violates any insurance law, or fails to comply with the Company's rules and regulations.

   Either party may voluntarily terminate this Agreement at any time by written notice addressed to the other, to become effective not earlier than 11 days from date of mailing by the Company or delivery to the Company or its designee. Such written notice may be delivered personally or by regular mail, and may be given by the Company or with the concurrence of the Company by the manager of the Agency to which the Field Representative is assigned. On termination, the Company's liability for remuneration of any kind shall cease except as set forth in the Field Representative Plan.

16. The failure of the Company to require strict compliance with the terms of this Agreement or of any of the rules or regulations of the Company shall not operate as a waiver of such terms or as a release of the Field Representative of his obligations hereunder.

17. In all disputes arising under this agreement between the Field Representative and the Company, the Laws of the State of New York shall apply.

18. The Field Representative covenants and agrees that after termination of the Contract, whether terminated by the Field Representative or by the Company, the Field Representative will not, directly or indirectly by or through any partner, agent, employer, or from on the Field Representative's behalf, advise, induce or attempt to induce any policyholder or annuitant of the Company or any subsidiary company of the Company to lapse, cancel or replace any insurance policy or annuity of the Company or of any subsidiary company. These prohibitions shall last for a period of 18 months following the termination of this Contract and shall be effective throughout the sales territory formerly covered by the Field Representative while subject to this Contract. In the event the Field Representative breaches this provision, the Field Representative agrees that the Company may compel the Field Representative's compliance with this provision by injunction, or by any other remedy at law or equity, or by any other remedy under this contract.

A-661-4 (Rev 5/01)                    Page 2 of 3

19  The terms and conditions of the Plan as expressed in "FIELD REPRESENTATIVES' PLAN, Rules and Regula-
tions, Tables and Illustrations," have been fully explained to me and, they, as may be prospectively amended by
the Company as to all Field Representatives from time to time, are hereby made a part of and are incorporated in
this agreement.

I understand that they include:

1.  Completion of all pre-contract requirements. Agent should be properly licensed/appointed or accompanied
by a properly licensed/appointed agent.

2.  Completion of a standard Prospect File.

3.  Payment of salary based on production and, except as provided in the Plan, there is no vesting of commis-
sions.

20  The terms, conditions and provisions of this agreement shall apply to the sale and servicing of individual disabil-
ity income policies and individual life insurance policies underwritten by Berkshire Life Insurance Company of
America ("BLICOA"), a wholly-owned life insurance subsidiary of Guardian.

**THIS AGREEMENT MAY NOT BE CHANGED EXCEPT IN WRITING SIGNED BY PARTY TO BE BOUND,
EXCEPT AS PROVIDED IN 19 ABOVE.**

**SEPARABILITY PROVISION.** If any provision of this Agreement is held to be invalid, the remainder of the Agree-
ment shall not be affected thereby.

**IN WITNESS WHEREOF,** this Agreement becomes effective only after having been signed by both the Field Rep-
resentative and by an authorized officer of the Company.

In presence of                                                   BY:

_____        _____        4/27/06
                                        Field Representative            (Date)

In presence of

_____        _____        5-19-06
                                        Authorized Company Officer      (Date)

A-661-4 (Rev 5/01)                       Page 3 of 3

RECEIVED
AGENT CONTRACT DEPT.

2006 MAY -9  AM 5: 55

## THE GUARDIAN INSURANCE & ANNUITY COMPANY, INC.
## FIELD REPRESENTATIVE AGREEMENT

Agreement made this ___27th___ day of ___April___, 20 06 by and between The Guardian Insurance & Annuity Company, Inc. ("**GIAC**"), a Delaware corporation and a wholly-owned subsidiary of The Guardian Life Insurance Company of America ("**Guardian Life**"), having its principal office located at 7 Hanover Square, New York, New York, 10004 and ___All Dongkwanbv___ ("**Field Representative**").

1.    The undersigned is presently a Field Representative of Guardian Life in accordance with a Field Representative         Agreement bearing an effective date of ___05.9.06___ _____("**Guardian Life FR Agreement**").

2.    GIAC hereby appoints the Field Representative for the limited purpose of soliciting applications for the products specified in Appendix A of this Agreement.

3.    The Field Representative shall at all times be associated with Park Avenue Securities LLC ("**PAS**"), a Broker-Dealer registered with the Securities and Exchange Commission ("**SEC**")       and a member of the National Association of Securities Dealers, Inc. ("**NASD**") as an NASD Registered Representative or NASD Registered Principal and, if the particular jurisdiction requires, shall be licensed or registered as a securities agent of PAS. The Field Representative must at all times be validly licensed, registered or appointed by GIAC as a variable contracts agent in accordance with the requirements of the jurisdiction where solicitations for contracts occur. The Field Representative may solicit for and sell contracts in any jurisdiction where such contracts are filed and approved for sale by the governmental authorities having jurisdiction, provided the Field Representative is validly licensed, registered or otherwise qualified as required for the solicitation and sale of the contracts in such jurisdictions.

4.    To the extent applicable, the Field Representative shall comply strictly with: (a) the laws, rules and regulations of all jurisdictions (state and local) in which the Field Representative solicits applications for and sells contracts; (b) federal laws and the rules, regulations of the SEC, (c) the rules of the NASD, (d) the rules and procedures of PAS, and (e) the rules and procedures of GIAC. The Field Representative understands that failure to comply with such laws, rules, regulations and procedures may result in disciplinary action against the Field Representative by the SEC,

1

a state or other local regulatory agency that has jurisdiction, the NASD, PAS and GIAC. Before any solicitations or sales of contracts are made, the Field Representative shall become familiar with and abide by the laws, rules, regulations and procedures of all of the above mentioned agencies or parties as are currently in effect and as they may be changed from time to time.

5.      The Field Representative shall have all applications for contracts accurately completed or reviewed and signed by the applicant and shall submit the applications to GIAC through PAS together with all payments received from applicants without any reductions. The Field Representative shall cause all checks or orders for contracts to be made payable to GIAC. GIAC shall reject any application that is submitted by or on behalf of a Field     Representative not appropriately licensed as required by paragraph 3 of this Agreement.

6.      The Field Representative shall not make any statements concerning the products except those that are contained in the current prospectuses for them and the prospectuses for their underlying variable investment options and shall not solicit for applications or make sales through the use of mailings, advertisements or sales literature or any other method of contact unless the material or a complete description of the method has been filed with the NASD and received written Approval of PAS from a Registered Principal whose office is located in a PAS Office of Supervisory Jurisdiction as that term is defined by NASD rules.

7.      In connection with the appointment of the undersigned as a GIAC Field Representative for the purpose set forth in paragraph 2 above, the entire Guardian Life FR Agreement referred to above and attached hereto as the Exhibit, including all compensation adjustment and service fee provisions, is incorporated herein by reference.   Guardian Life FR Agreement compensation provisions that do not apply to the products in Appendix A are as noted below. All references to "Company" within the Guardian Life Agency Agreement shall apply with full force and effect to GIAC Additionally, the Registered Representative's Agreement between the Field Representative and PAS and the Agent's Agreement between the Field Representative and GIAC are incorporated herein by reference and attached hereto as Exhibits.

2

8.  This Agreement may be terminated as outlined in Paragraph 15 of the Guardian Life FR Agreement.   In addition, it shall be automatically terminated if the Guardian Life FR Agreement, PAS Registered Representative Agreement or GIAC Agent's Agreement is terminated.

IT SHALL BE EXPRESSLY UNDERSTOOD BY THE FIELD REPRESENTATIVE THAT THIS AGREEMENT SHALL NOT BE EFFECTIVE UNLESS THE FIELD REPRESENTATIVE IS VALIDLY LICENSED IN ACCORDANCE WITH THE REQUIREMENTS OF THE JURISDICTIONS WHERE SOLICITATIONS FOR CONTRACTS OCCUR.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above

_____
WITNESS

_____
AUTHORIZED COMPANY OFFICER
DONALD QUEEN

_____
WITNESS

_____
FIELD REPRESENTATIVE

3

## APPENDIX A
### List of Products

1. Variable Whole Life Insurance Policies with Modified Scheduled Premiums marketed under the name Park Avenue Life – Millennium Series ("**PAL**").

2. Flexible Premium Adjustable Variable Life Insurance Policies marketed under the name Park Avenue Variable Universal Life – Millennium Series ("**VUL**")*

3. Survivorship Flexible Premium Adjustable Variable Life Insurance Policies marketed under the name Park Avenue Survivorship Variable Universal Life – Millennium Series ("**SVUL**")*

4. Pension Trust Flexible Premium Adjustable Variable Life Insurance Policies marketed under the name Pension Trust Park Avenue Variable Universal Life – Millennium Series ("**PT-VUL**")

5. Pension Trust Survivorship Flexible Premium Adjustable Variable Life Insurance Policies marketed under the name Pension Trust Park Avenue Survivorship Variable Universal Life – Millennium Series ("**PT-SVUL**")

*Enhanced Cash Value versions of these products are also available. Where applicable herein, these versions are designated "eVUL" and "eSVUL" respectively.

## APPENDIX B
### PAL COMPENSATION

| Policy Years | LPC Factor on Policy Premiums | Unscheduled Payments 1985 Version FRs | Unscheduled Payments 1956/1967 Version FRs |
|---|---|---|---|
| 1 | 36 | 3.325% | 2.85% |
| 2 through 10 | * | 3.500% | 3.00% |

*Renewal compensation for preceding employment years on PAL policy premiums shall be the same as set forth in the Field Representatives Plan manuals for existing Plan versions (except that the rates applicable under Part A shall be 50% of standard rates for those Field Representatives belonging to the 1985 FR Plan version). FR Plan

4

compensation factors shall operate in accordance with the effective date of the
Guardian Life FR Agreement.

The first policy year LPC factor of 36 on policy premiums shall be reduced where
policies are issued at ages over 70 with actual rates payable determined by deducting
from the figure 106 ages of applicable insureds as of policy issue dates.

No compensation shall be payable on PAL policy premiums skipped under the
Premium Skip Option of PAL policies. If unscheduled payments are received when
policies should be on the Premium Skip Option, renewal compensation on such
payments shall be calculated at 5% and applied up to amounts of premium that
correspond to renewal PAL policy premiums that would otherwise have been paid if
not for the Premium Skip Option being in effect with standard renewal rates on
unscheduled payments applied to any premiums received above such PAL policy
premium levels.


## APPENDIX C
## VUL & SVUL COMPENSATION
## (INCLUDING PT-VUL & PT-SVUL)

| Policy Years | LPC Factor on Target Premiums | Excess Premiums |
|---|---|---|
| 1 | 36 | 3.325% |
| 2 through 10 | * | 3.500% |

*4.5% policy years two through ten credited as Commission Equivalent Compensation
(PGF). In addition .0125% of unloaned account values shall be credited monthly
policy years 11 and over as long as the field representative agreement shall not have
been terminated.

### Special Compensation on PT-VUL & PT-SVUL
### Applicable to 1956/1967 Version Field Representatives

In lieu of the compensation outlined above as it applies to the PT-VUL and PT-SVUL
products, FRs in the 1956 and 1967 Plan versions receive 50% of first policy year
target premiums, 4.0% of target premiums policy years two through ten, 2.85% of first
policy year excess premiums, 3.0% of excess premiums policy years two though ten

5

and, as long as the field representative agreement shall be active, .15% of unloaned account values 11+ policy years credited monthly at .0125%

## APPENDIX D
## eVUL & eSVUL COMPENSATION

| Policy Years | LPC Factor on Target Premiums | Excess Premiums |
|---|---|---|
| 1 | 11 | 3.325% |
| 2 through 10 | * | 3.500% |

*24% policy years two through four and 11% policy years five through ten credited as Commission Equivalent Compensation (PGF). In addition, .0125% of unloaned account values shall be credited monthly policy years 11 and over as long as the field representative agreement shall not have been terminated.

## APPENDIX E
## ALLOCATION OF PREMIUMS AND THEIR EFFECT
## ON VUL, SVUL, PT-VUL, PT-SVUL, eVUL & eSVUL COMPENSATION

A. General

In a first policy year, premiums will first be applied to policy target premium. These will be compensated at first year rates. Any premiums received in the first year of a policy exceeding policy target premium will be considered excess premium to be compensated at excess rates.

In policy years 2 through 10, any premium received up to the policy target premium will be applied as policy target premium and receive compensation at target premium renewal rates. Any premium exceeding the policy target premium in policy years two through ten will be considered excess premium to be compensated at excess rates.

6

B. Increases In Coverage

Coverage increases will be reflected in self-contained segments of policies that have their own policy effective dates, policy year durations and target premiums. Premiums for policies with increases in coverage will be applied to each coverage and associated target premiums in the order the coverages were issued (earliest first). When the sum of the premiums during a given policy year exceeds the sum of all applicable target premiums, any additional amount will be allocated prorata based on target premiums for each coverage. The amount thus allocated will be processed as outlined in the above general description (i.e. it will be processed with reference to policy years of the coverages and amounts of applicable target premiums paid).

C. Decreases In Coverage

A coverage decrease will be applied to a last previous coverage increase, if any, or to the initial coverage should no coverage increase have taken place. Such decrease will not reduce target premium.

7



GUARDIAN

## THE GUARDIAN INSURANCE & ANNUITY COMPANY, INC.
## AGENT'S AGREEMENT

**Parties:**

Agent – *Ali Torabkhanlar* , who resides at

*14271 S. 8th ave.* *Arcadia*
STREET ADDRESS                                                    CITY

*CA* _____ (hereinafter called "Agent")
STATE

Company – The Guardian Insurance & Annuity Company, Inc
7 Hanover Square, New York, NY, 0004
(hereinafter called "Company")

**Effective Date:**

_____
OFFICE USE ONLY

**1. Appointment.**

The Company hereby appoints the Agent to solicit and remit to the Company applications for the purchase of group, fixed annuities, fixed benefit life insurance policies, retirement savings plans qualified under Section 401 of the Internal Revenue Code and such other products offered by the Company to the public from time to time (hereinafter referred to as the "Contracts") as specifically authorized by the Company and for which the Company is properly licensed under federal, state and local laws for the jurisdiction(s) in which the Agent will solicit business. This appointment shall not be effective unless and until the Agent is duly licensed or otherwise qualified to sell the Company's Contracts under applicable federal, state and local laws. The Agent agrees not to solicit or procure applications for Contracts in any jurisdiction in which the Agent is not so licensed or otherwise qualified or in which the Company is not authorized to offer or sell Contracts. The Agent shall personally witness and transmit to the Company through the agency or office to which he or she is attached all applications for the Contracts, collect initial payments, countersign (when necessary) and promptly deliver any Contracts forwarded to him or her by the Company through the agency or office for that purpose, and shall perform such other duties and services for Contract owners and Contract beneficiaries pertaining to the business of the Company as may be required.

**2. Compensation.**

Subject to the provisions of this Agreement and to any other agreement in effect regarding the assignment of commissions, the Agent will be paid commissions on the 15th and the 30th days of each month on all payments which are actually received and accepted by the Company on Contracts issued by the Company in connection with applications submitted under this Agreement. The amount of commissions will be determined in accordance with the Schedule of Commissions in effect when such payments are actually received and accepted by the Company. This Schedule is subject to change by the Company at any time and without notice but no such change shall affect commissions payable with respect to any premiums received prior to the effective date of the change except as provided in the Schedule. Commissions will be paid to the Agent only so long as he or she remains an Agent of the Company, and is duly licensed and registered. The Company has the right to offset any indebtedness to it against commissions otherwise due the Agent.

**3. Rejected Applications.**

The Company reserves the right to reject any applications, orders or payments remitted by the Agent and to refund to customers any payments made by them. If the Agent has received commissions on such refunded payments, the Agent agrees to repay such commissions in full immediately. If the Agent does not do so, the Company is authorized to deduct such amounts from commissions due or which may become due to the Agent in the future.

RECEIVED
AGENT LICENSING (GU)
2005 MAR -9 AM 5:55

G.B.G. 1567 (5/01)                                 Page 1 of 4

-99

4. Prompt Remittance.

The Agent agrees to remit, immediately upon execution, all applications and orders solicited by him or her, together with the full amount of all payments received from customers, without deduction. Checks or money orders for payments shall be drawn to the order of the Company. The Agent has no authority whatsoever to negotiate any financial instruments made payable to Guardian Life or any of its subsidiaries and is not authorized to request that any negotiable instruments be made payable to him or her personally or to any entity with which he may be affiliated. The Agent further agrees to comply with all other rules and procedures for the handling of applications or orders which may be established by the Company from time to time.

5. License.

The Agent has become, or has applied to become, qualified to sell the Contracts under applicable federal, state and local laws and agrees to keep such qualification in effect. The Agent further agrees to comply, if applicable, with rules of all other applicable federal and state laws, rules and regulations applicable to the conduct of the Agent's business as contemplated by this Agreement. The Agent understands that failure to comply with such rules, regulations, acts or statutes may result in disciplinary action against him or her by the Company and by any governmental authorities having jurisdiction. It is the agent's responsibility to be properly licensed in all states that prior he or she does business.

6. Proper Use of Advertising and Sales Material.

The Agent shall use no advertising or sales material, prospectus, proposal, or representation either in general or in relation to a particular Contract or concepts unless furnished or previously approved by the Company or the Market Conduct and Compliance Unit. The Agent shall not prepare or distribute any illustration, chart, graph, circular, statement or document of any sort, misrepresenting the terms, benefits or advantages of any Contract issued by the Company or the Market Conduct and Compliance Unit. Furthermore, the Agent shall not make any misleading statement as to the benefits to be received on any Contract issued by the Company, or as to historical or future investment performance relating to such Contract, or as to the financial position of the Company or the Market Conduct and Compliance Unit. All manuals, guides, books, tapes, programs and other materials developed by the Company which may be delivered to the Agent from time to time, and the information contained therein, will remain the sole and exclusive property of the Company or the Market Conduct and Compliance Unit, and shall be used solely in the solicitation of applications for Contracts covered by this Agreement. These materials may not be reproduced in any way, or disseminated to anyone other than a bona fide customer, without the prior written approval of an authorized officer of the Company. None of the information furnished to the Agent shall be disclosed to the Company's competitors without the prior written consent of the Company. In regard to those Contracts that are subject to the jurisdiction of the SEC, the Agent further agrees that he or she will make no written or oral representations concerning such Contracts unless such representations are consistent with the information contained in the current prospectuses for such Contract and its underlying investment options or any authorized sales literature made available by the Company. The Agent also agrees to comply with the rules and regulations of the state insurance and security laws.

7. Independent Contractor Status.

The relationship of the Agent to the Company is that of an independent contractor, and nothing contained herein shall be construed to create an employer and employee relationship between the parties. The Agents, therefore, are responsible for developing his or her own sales prospects and may freely determine, subject to applicable legal, regulatory and Company requirements, when and where he or she shall solicit business contemplated by this Agreement. The Agent shall comply with and be bound by the rules of the Company now in force or as they hereafter may be amended or supplemented; such rules, however, are not to interfere with such freedom of action of the Agent. The Agent shall not be required to spend any particular portion of his or her working time acting as an Agent for the Company. The Agent shall be free to continue employment with any other person, firm or corporation.

8. Rights of the Company.

In addition to other rights set forth herein or implied or necessitated by the terms hereof, the Company or the Market Conduct and Compliance Unit specifically reserves the rights to (a) modify or amend any Contract, (b) discontinue or withdraw any Contract from the Agent's jurisdiction or any part thereof (and this may be done without prejudice to continuing such Contract in any other jurisdiction in which the Company is authorized to do business or in any other part of the Agent's jurisdiction); (c) fix maximum and minimum limits on the amounts for which any Contract may be issued; (d) modify or alter the conditions or terms under which any Contract may be sold, or regulate its sale in any way; (e) cease doing business in all or any part of the Agent's jurisdiction, (f) change commissions or other compensation on premiums received in the future upon prior notice to the Agent; and (g) require that the Agent be bonded in an amount which bears a reasonable relationship to the composition and volume of the Agent's business with the Company. The Company's rights as reserved in (a) through (e) may be exercised at any time and without prior notice to the Agent. Nothing contained herein shall prevent or restrict the Company from appointing other agents either within or outside Agent's jurisdiction to solicit applications for Contracts.

9. Expenses.

The Company shall not be responsible for the Agent's expenses, including but not limited to bonding, transportation, postage, expressage, advertising, telephone, telex or facsimile charges, and other expenses incidental to the Agent's business.

10. Return of Materials.

In the event of termination of this Agreement, all prospectuses, application forms, sales literature, customer lists, or other materials or supplies furnished to the Agent by the Company shall be promptly returned to the Company.

11. Authority of Agent.

The Agent shall have no power or authority other than as herein expressly granted, and no other or greater powers shall be implied from the grant or denial of powers specifically mentioned herein. The Agent shall have no power or authority to make, alter or discharge any Contract in the name of the Company, or to bind the Company by any promise or statement, or to make, accept or endorse notes, or to incur any liability on behalf of the Company, or to waive a forfeiture or waive, alter or amend the performance, provisions, terms or conditions of any contract or to extend the time for the payment of monies due the Company, or to collect money for the Company except as to the collection of the initial payment on Contracts issued by the Company pursuant to this Agreement. Nothing contained herein shall prevent or restrict the Agent from acting as agent for other insurance companies in any jurisdiction.

12. Contract Not Assignable.

Except to the extent permitted under Paragraph 13, the rights and benefits accruing hereunder to the Agent are not assignable.

13. Assignment of Commissions.

No assignment of commissions by the Agent shall be permitted except in such cases, if any, as shall be expressly authorized in advance in writing by the Company. Any purported assignment of commissions without the written consent of the Company shall be void.

14. Indemnification.

The Agent shall indemnify and hold the Company harmless from any loss or expense which results from any act or omission committed by the Agent in the conduct of his or her activities under this Agreement.

15. General Provisions.

(a) The Agent and the Company agree to fully cooperate with each other in any state or regulatory investigation. The Agent and the Company will promptly inform the other party of any regulatory investigation or proceeding being conducted with respect to their activities.

(b) The non-enforcement or waiver of any provision of this Agreement by a party shall not imply the subsequent waiver of such provision or any simultaneous or subsequent waiver of any other provision hereof.

(c) Any notice under this Agreement shall be given by telegraph, facsimile or by mail, postage paid, addressed as indicated above or to such other address as a party may later designate in writing.

(d)   To the extent this Agreement may be in conflict with any applicable law or regulation, this Agreement shall be construed in a manner not inconsistent with such law or regulation. The invalidity or illegality of any provision of this Agreement shall not be deemed to affect the validity or legality of any other provision of this Agreement.

(e)   This Agreement supersedes all previous agreements, oral or written, between the parties hereto, and no modification hereof shall be valid unless made in writing and signed by all parties. This Agreement shall be governed by the laws of the State of New York.

(f)   The Agent agrees to fully cooperate with the Company in the defense of any action filed against the Agent and/or company by a third party for alleged acts that occur while this Agreement was in effect.

16.   Termination.   This Agreement may be terminated by either party at any time for any reason upon written notice to the other. This Agreement may be terminated immediately for cause if the Agent (a) has wrongfully withheld any funds, property or documents belonging to the Company, (b) has misrepresented any product or service offered by or through the Company, (c) has failed to comply with the terms of this Agreement or the Company's rules and regulations currently in force or later brought to the Agent's attention in any manner, (d) if the Agent commits or admits to a defalcation or (e) if the license of the Agent is revoked, suspended, or refused renewal by any federal or state regulatory body or self-regulatory organization. Upon termination for cause, the Agent shall have no further rights or privileges under this Agreement, except as otherwise provided herein. The Agent shall not, at any time, either during or after termination of this Agreement, induce any Contract owner of the Company to relinquish, surrender or lapse any Contract issued by the Company without prior written approval of the Company.

Executed in duplicate at New York, New York on or as of the "Effective Date" shown above.

THE GUARDIAN INSURANCE & ANNUITY COMPANY, INC.

by _____
SIGNATURE OF AUTHORIZED OFFICER

_____
SIGNATURE OF AGENT

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

**CASE NAME:**   The Guardian Life Insurance etc. vs. John Andraos and Andraos Capital Management & Insurance Services

**CASE NOS.:**   CV-05732-GPS-FMO

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 725 South Figueroa Street, Suite 2500, Los Angeles, California 90017-5408

On April 11, 2008, I served the foregoing document described as:

## FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

in this action by placing a true copy thereof as follows:

| | |
|---|---|
| Richard C. Darwin, Esq.<br>BUCHALTER NEMER<br>A Professional Law Corporation<br>1000 Wilshire Boulevard, Suite 1500<br>Los Angeles, CA 90017<br>Telephone: (213) 891-0700<br>Facsimile: (213) 896-0400<br><br>Attorney for Defendant | |

☒   **BY NOTICE OF ELECTRONIC FILING**.   The above-listed counsel have consented to electronic service and have been automatically served by the Notice of Electronic Filing, which is automatically generated by CM/ECF at the time said document was filed, and which constitutes service pursuant to FRCP 5(b)(2)(D).

☒   **FEDERAL**   I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 11, 2008 at Los Angeles, California.

*Elsa M. Morales*

Elsa M. Morales